[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Teagarden v. Igwe*, Slip Opinion No. 2024-Ohio-5772.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION No. 2024-OHIO-5772

THE STATE EX REL. TEAGARDEN *v.* IGWE ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Teagarden v. Igwe*, Slip Opinion No. 2024-Ohio-5772.]**

*Mandamus—Public-records requests—R.C. 149.43—Without submitting evidence that respondent created or maintained a requested record, relator has not proved by clear and convincing evidence that respondent violated Public Records Act by referring relator to where the requested documents were posted—A public-records request does not need to use particular language to invoke Public Records Act, but it must be clear that the requester is requesting a public record instead of merely asking for assistance in locating it—Writ granted in part and denied in part, and statutory damages awarded in amount of $1,000.*

(No. 2023-1565—Submitted September 17, 2024—Decided December 10, 2024.)

IN MANDAMUS.

_____

The per curiam opinion below was joined by DONNELLY, STEWART, and BRUNNER, JJ. KENNEDY, C.J., concurred in part and dissented in part, with an opinion. FISCHER, J., concurred in part and dissented in part and would not award statutory damages. DEWINE, J., concurred in part and dissented in part, with an opinion joined by DETERS, J.

**Per Curiam.**

**{¶ 1}** In this original action, relator, Trevor J. Teagarden, an inmate at the Pickaway Correctional Institution, seeks (1) a writ of mandamus ordering respondents, Nnacho[1] Igwe, Atiboroko Oshobe, and Cora Handley, to provide copies of public records responsive to his requests, (2) statutory damages, and (3) court costs. For the reasons explained below, we grant the writ in part and deny it in part and award Teagarden $1,000 in statutory damages. However, we deny Teagarden's request for court costs.

## I. FACTS AND PROCEDURAL HISTORY
### A. Public-Records Requests and Responses

**{¶ 2}** This case concerns public-records requests that Teagarden made between June and August 2023 via electronic kites. "A kite is a type of written correspondence between an inmate and prison staff." *State ex rel. Griffin v. Szoke*, 2023-Ohio-3096, ¶ 3.

**{¶ 3}** On June 29, 2023, Teagarden sent a kite to the prison library requesting "a copy of ODRC Medical Protocol B1, Consultation Referral." Oshobe, who was then an assistant librarian at the prison, responded later that day. The responsive part of her kite stated: "You can stop by the law library whenever you can to review 68-Med-01 to 24 to get the ODRC Medical Protocol that you are

---

1. Respondent Nnacho Igwe's first name was spelled incorrectly on the complaint and in subsequent filings in this court. The correct spelling, which we use here, appears on her affidavit, filed with respondents' evidence in this case.

requesting." On July 5, Teagarden sent another kite to the library requesting "a copy of the ODRC Medical Protocol B-11." Oshobe responded later that day by referring Teagarden to her response to his June 29 request.

{¶ 4} On July 11, Teagarden sent a kite to the prison's recreation office requesting "a copy of the recreation schedule(s) for all units: A, B, C, D, Frazier and TPU." Handley, an activities therapist at the prison, responded the next day that "[r]ecreation calendars are posted in the units monthly."

{¶ 5} On July 13, Teagarden sent a kite to the library stating, "Please provide me with the index of all ODRC Medical Protocols." Oshobe responded later that day: "[T]he information you are requesting is in the main law library for inmates in general population." On July 29, Teagarden sent a kite to the library requesting "a copy of the ODRC Policy Index." Igwe, the prison librarian, responded, "A copy of updated ODRC policy index is available in the law library. All you need to do is ask the law library workers to give it to you to review whenever you are in the law library."

{¶ 6} On August 7, Teagarden sent a kite to the recreation office requesting "a copy of the August Recreation Schedule for all units." Handley responded, "As I have told you before, Rec Schedules are posted in all units and the gym."

{¶ 7} On August 26, Teagarden submitted two kites to the library, one addressing Oshobe and one addressing Igwe. In both kites, he requested "a copy of the sign in / log sheet for the Lexis Nexis terminals on August 24th and 25th." Oshobe responded that the sign-in sheet belonged to the library and could not be given to any inmate. Igwe responded similarly, telling Teagarden that the sign-in sheet was library property, was used for the library's audit, and could not be given to inmates.

## B. This Mandamus Action

{¶ 8} In December 2023, Teagarden filed a complaint for a writ of mandamus ordering respondents to produce copies of the requested records.

Teagarden also requests that he be awarded statutory damages and court costs. In March 2024, we denied respondents' motion to dismiss, ordered respondents to file an answer, and granted an alternative writ setting a schedule for the submission of evidence and briefs. 2024-Ohio-880. Both parties have submitted evidence and briefs.

## II. ANALYSIS

### A. Legal Standards

{¶ 9} "[U]pon request by any person, a public office or person responsible for public records shall make copies of [a] requested public record available to the requester at cost and within a reasonable period of time." R.C. 149.43(B)(1).

{¶ 10} Mandamus is an appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act. *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 2006-Ohio-903, ¶ 6; R.C. 149.43(C)(1)(b). To obtain the writ, "the requester must prove by clear and convincing evidence a clear legal right to the record and a corresponding clear legal duty on the part of the respondent to provide it." *State ex rel. Griffin v. Sehlmeyer*, 2021-Ohio-1419, ¶ 10.

### B. Application of Standards to Teagarden's Kites and the Responses

{¶ 11} For each kite, we must determine whether Teagarden made a proper public-records request and, if he did, whether respondents satisfied their obligations under the Public Records Act. This opinion considers the kites in groups of similar requests and out of chronological order for convenience of analysis.

#### 1. July 11 and August 7 kites to the recreation office

{¶ 12} Teagarden's July 11 and August 7 kites to the recreation office requested copies of several recreation schedules, which respondents do not dispute are public records. Nonetheless, respondents argue that Teagarden did not submit the public-records requests to the proper records custodian. Respondents submitted an affidavit from Courtney Dean, the acting unit management chief at Pickaway

4

Correctional Institution, who also serves as the backup public-information officer. Dean attested that inmates at the prison are instructed to direct public-records requests to the warden's administrative assistant and that Teagarden did not do so.

**{¶ 13}** This court recently rejected a similar argument from the Ohio Department of Rehabilitation and Correction ("ODRC") that an inmate must direct his public-records requests to the prison's public-information officer. *State ex rel. Clark v. Dept. of Rehab. & Corr.*, 2024-Ohio-770, ¶ 14. In that case, we noted that the Public Records Act "requires a requester to transmit the public-records request to the 'public office or person responsible for the requested public records.'" *Id.*, quoting R.C. 149.43(C)(2). We rejected the department's argument because the inmate submitted evidence indicating that he had directed his public-records request to the prison office that maintained the requested records. *Id.*

**{¶ 14}** In this case, Teagarden asserts in his brief that Handley was the creator of the requested recreation schedules. Unlike the requester in *Clark*, however, Teagarden did not submit any evidence demonstrating that Handley or the recreation office created or maintained the schedules. Without submitting such evidence, Teagarden has not proved by clear and convincing evidence that Handley violated the Public Records Act by referring him to where the schedules are posted.

*2. August 26 kites to the library*

**{¶ 15}** On August 26, 2023, Teagarden sent two kites—one to Oshobe and one to Igwe—requesting a copy of the sign-in sheet for the LexisNexis computer terminals for August 24 and 25. Both Oshobe and Igwe responded, refusing to provide him with the requested copy. Respondents do not argue in their briefs that the sign-in sheet is not a public record, nor do they defend the response that the sign-in sheet cannot be given to inmates. Respondents instead argue that although the library staff may have had access to the requested record, they were not the particular officials charged with a duty to oversee public records or respond to public-records requests.

{¶ 16} However, the LexisNexis computer-terminals sign-in sheet documents an activity within the library—not any other office of the prison. Igwe's response to the kite confirms that the library keeps and uses the sign-in sheet. Accordingly, the sign-in sheet is a public record, and the library staff is responsible for it. R.C. 149.011(G); *Clark*, 2024-Ohio-770, at ¶ 14. Therefore, Igwe's and Oshobe's refusals to provide Teagarden with a copy of the requested sign-in sheet violated the Public Records Act. R.C. 149.43(B)(1). As a result, Teagarden is entitled to a writ of mandamus ordering Igwe and Oshobe to provide him with a copy of the sign-in sheet for the LexisNexis computer terminals for August 24 and 25, 2023.

*3. July 13 and July 29 kites to the library*

{¶ 17} On July 13, Teagarden sent a kite to the library stating, "Please provide me with the index of all ODRC Medical Protocols." On July 29, Teagarden sent a kite to Igwe specifically, in which he requested "a copy of the ODRC Policy Index." Oshobe and Igwe both responded by telling Teagarden that the index he requested was available in the law library. Respondents argue that even though the librarians may have had access to the requested records, they were not the persons responsible for the records.

{¶ 18} Teagarden attests in his affidavit that the indexes he requested are available on a website that is not accessible to prisoners and that the library staff has a duty to provide the indexes to the inmates.

{¶ 19} An assistant librarian's job duties include helping inmates find reading materials and making copies of legal documents. However, that does not make a librarian or an assistant librarian the custodian of, or the person responsible for, every record or other material in the library. Unlike the sign-in sheet discussed above, the materials in the library's collection—such as the requested indexes—do not document the activities of the library. This remains true even if, as Teagarden

asserts, certain materials in the library's collection must be accessed with the assistance of library staff.

{¶ 20} A public-records request does not need to use particular language in order to invoke the Public Records Act. *See State ex rel. Ware v. Dept. of Rehab. & Corr.*, 2024-Ohio-1015, ¶ 15-16 (plurality opinion) ("The Public Records Act contains no provision requiring that a requester formally label a public-records request as a 'formal public records request'" and "a requester is generally not required to cite a particular rule or statute when making a request"), citing *State ex rel. Parker Bey v. Byrd*, 2020-Ohio-2766, ¶ 14 (the Public Records Act does not "require a requester to identify the legal authority providing a basis for the request when requesting a record, and records that are open to the public should be reasonably provided."). However, it must be clear that the requester is requesting a public record instead of merely asking for a librarian's assistance in finding something in the library. The requests at issue here were requests for materials within the library's collection, not records that were created or maintained by the library. As a result, it is reasonable that library staff would view the requests as seeking assistance in finding the requested materials—just like any other time an inmate asks for a book or other item in the collection.

{¶ 21} In his July 29 kite, Teagarden specifically asked for a copy of the policy index. However, there is a procedure for inmates to make copies of materials in circulation with the assistance of library staff. Accordingly, Teagarden's use of the word "copy" does not make clear that the July 29 kite was meant as a public-records request. Ultimately, because the kites did not appear to be public-records requests when viewed in context, Oshobe and Igwe did not violate the Public Records Act by treating the kites as regular requests for a librarian's assistance instead of responding to the kites as public-records requests.

*4. June 29 and July 5 kites to the library*

**{¶ 22}** In these kites, Teagarden requested copies of ODRC medical protocols B-1 and B-11. In addition to the same arguments respondents made regarding the indexes, respondents argue that Teagarden's requests for medical policies, in the June 29 and July 5 kites, were vague because the policy numbers he referred to, B-1 and B-11, did not correspond to ODRC's numbering system for the medical policies, which is 68-MED-01 through 68-MED-24. Respondents' argument is supported by Oshobe's description of the medical policies in her response to Teagarden's June 29 request and by her invitation to him to review the protocols in the library to find the one he was requesting. Teagarden did not meaningfully address the ambiguity of these requests in his brief or submit evidence to dispute that Oshobe invited him to review the policies.

**{¶ 23}** A public-records requester has the responsibility "'to identify with reasonable clarity the records at issue.' " *State ex rel. Morgan v. New Lexington*, 2006-Ohio-6365, ¶ 29, quoting *State ex rel. Fant v. Tober*, 1993 WL 173743, *1 (8th Dist. April 28, 1993). Because Teagarden's June 29 and July 5 requests referred to policy numbers that did not exist, he failed to identify with reasonable clarity the records he was seeking. "If a requester makes an ambiguous . . . request . . . , the public office or the person responsible for the requested public record may deny the request but shall provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office . . . ." R.C. 149.43(B)(2).

**{¶ 24}** Oshobe's response to the June 29 kite complied with R.C. 149.43(B)(2) because she clarified how the medical policies are numbered and invited him to review the policies to determine what to request. Oshobe's response to the July 5 kite, which referred to her June 29 response, likewise complied with R.C. 149.43(B)(2). It was appropriate for her to refer to her previous answer because Teagarden's July 5 kite was also a request for a nonexistent record. *See*

*State ex rel. Laborers Internatl. Union of N. Am., Local Union No. 500 v. Summerville*, 2009-Ohio-4090, ¶ 6 (a reiteration of a request does not require an additional response). Therefore, Oshobe's responses to Teagarden's June 29 and July 5 kites did not violate the Public Records Act.

## C. Statutory Damages

{¶ 25} A public-records requester shall be entitled to statutory damages if (1) he transmitted a written public-records request by hand delivery, electronic submission, or certified mail, (2) he made the request to the public office or person responsible for the requested records, (3) he fairly described the records sought, and (4) the public office failed to comply with an obligation under R.C. 149.43(B). R.C. 149.43(C)(2). "[U]pon request by any person, a public office or person responsible for public records shall make copies of the requested public record available to the requester at cost and within a reasonable period of time." R.C. 149.43(B)(1).

{¶ 26} In their responses to Teagarden's August 26 kites, Igwe and Oshobe failed to provide Teagarden with copies of records responsive to proper public-records requests and thus failed to comply with their obligations under R.C. 149.43(B)(1). Teagarden's electronic kites constitute electronic submission for purposes of R.C. 149.43(C)(2). *Sehlmeyer*, 2021-Ohio-1419, at ¶ 21. He submitted the August 26 kites to the public office or person responsible for the requested records. Lastly, he fairly described the records sought. Therefore, Teagarden is entitled to statutory damages in connection with his August 26 request for the library's LexisNexis computer terminals sign-in sheet for August 24 and 25. However, he is not entitled to statutory damages in connection with his June, July, or August 7 requests.

{¶ 27} "Statutory damages accrue at the rate of $100 for each business day the [public] office failed to meet one of R.C. 149.43(B)'s obligations, beginning on the day the requester files a mandamus action, up to $1,000." *State ex rel. Horton*

*v. Kilbane*, 2022-Ohio-205, ¶ 15, citing R.C. 149.43(C)(2). R.C. 149.43(C)(2) "'does not permit stacking of statutory damages based on what is essentially the same records request.'" *State ex rel. Ware v. Akron*, 2021-Ohio-624, ¶ 22, quoting *State ex rel. Dehler v. Kelly*, 2010-Ohio-5724, ¶ 4. Additionally, when a requester makes multiple requests to the same office on the same day concerning the same general subject matter, the requester is entitled to only a single statutory-damages award, not an award for each record requested. *State ex rel. Ware v. Parikh*, 2023-Ohio-2536, ¶ 31.

{¶ 28} Teagarden's two kites on August 26 requested the same records from the same office, and the requests concerned the same general subject matter. Therefore, we construe them as one public-records request for purposes of calculating statutory damages. *Id.* at ¶ 31. Because respondents never provided Teagarden with copies of the records requested in those kites, he is entitled to the maximum $1,000 in statutory damages.

### D. Court Costs

{¶ 29} Teagarden requested an award of court costs, but there are no court costs to award because he filed an affidavit of indigency. *State ex rel. Straughter v. Dept. of Rehab. & Corr.*, 2023-Ohio-1543, ¶ 16. Therefore, we deny his request for court costs.

### III. CONCLUSION

{¶ 30} For the foregoing reasons, we grant a writ of mandamus ordering respondents to produce to Teagarden a copy of the sign-in sheet for the LexisNexis computer terminals for August 24 and 25, 2023, but we deny Teagarden's request for a writ of mandamus as to the other records he requested. We award Teagarden $1,000 in statutory damages and deny his request for court costs.

Writ granted in part
and denied in part.

———————

10

**KENNEDY, C.J., concurring in part and dissenting in part.**

{¶ 31} Relator, Trevor J. Teagarden, transmitted eight public-records requests through electronic kites to two offices at the Pickaway Correctional Institution (the "institution"), where he is confined. The majority concludes that only two of the requests—asking for copies of the LexisNexis computer-terminals sign-in sheet from August 24 and 25, 2023—were improperly denied. I agree with the majority's decision to grant a writ of mandamus ordering respondents Nnacho Igwe and Atiboroko Oshobe to produce copies of that record. I also agree with the majority's decision to deny Teagarden court costs.

{¶ 32} I part ways with the majority, however, regarding its decision to deny Teagarden's writ petition to the extent that it requests that respondents, Cora Handley, Igwe, and Oshobe, be ordered to fulfill his other public-records requests and regarding its decision to award him only $1,000 in statutory damages. I would order respondents to produce, in addition to the LexisNexis sign-in sheet, copies of the institution's recreation schedules in effect on July 11 and August 7, 2023, the index of all Ohio Department of Rehabilitation and Correction ("ODRC") medical protocols, the ODRC medical protocols "B-1, Consultation Referral" and B-11, and the ODRC policy index.

{¶ 33} I would also award Teagarden statutory damages in the amount of $8,000—$1,000 for each public-records request that he transmitted to the public office or person responsible for the public record that was improperly denied under R.C. 149.43.

{¶ 34} Accordingly, I concur in part and dissent in part.

**I. TEAGARDEN'S PUBLIC-RECORDS REQUESTS**

{¶ 35} As with any petition for a writ of mandamus to compel production of public records, the devil is in the details, but the majority keeps no eye on the devil.

{¶ 36} In March 2024, prior to submitting his evidence in this case, Teagarden sent a kite to the warden's office at the institution, asking, "Are copies of the ODRC policies to be provided by the Librarian?" He received the response, "Mr. Teagarden, they can provide copies for your review."

{¶ 37} From June 29 through August 26, 2023, Teagarden transmitted eight public-records requests through the institution's kite system to two public offices at the institution. For a detailed understanding of what a kite is, what the contents of a kite are, and what a kite looks like, see my opinion concurring in part and dissenting in part in *State ex rel. Berry v. Booth*, 2024-Ohio-5774, ¶ 64-70.

{¶ 38} For ease of discussion, Teagarden's public-records requests are grouped below by the public office he transmitted his requests to.

*A. Requests Sent to the Institution's Recreation Office*

{¶ 39} Teagarden transmitted two public-records requests to the institution's recreation office. In the "Form Info" section of both requests, Teagarden chose "Recreation" in the category section and "Kite – Recreation" in the form section. The first request was transmitted on July 11, and the second request was transmitted on August 7. The kites are discussed below in this order.

{¶ 40} In the general details-of-request section of the kite form, Teagarden wrote, "Provision of recreation schedule" and "Provision of a copy of the August Recreation Schedule." In the specific details-of-request section, which instructs, "**Please state the nature of your kite. Be specific**," Teagarden wrote, "Please provide me with a copy of the recreation schedule(s) for all units: A, B, C, D, Frazier and TPU" and "Please provide me with a copy of the August Recreation Schedule for all units." (Boldface in original.)

{¶ 41} Handley, an activities therapist, closed both kites and wrote, "Recreation calendars are posted in the units monthly" and "As I have told you before, Rec Schedules are posted in all units and the gym."

*B. Requests Sent to the Institution's Library*

{¶ 42} In total, Teagarden transmitted six public-records requests to the institution's library. Three of those requests were transmitted to the library, and the other three requests were transmitted to a particular librarian.

{¶ 43} Of those six requests, three requests asked for copies of ODRC medical protocols, one request asked for a copy of the ODRC policy index, and two requests asked for a copy of the sign-in sheet for the LexisNexis computer terminals from August 24 and 25, 2023.

### 1. Requests for ODRC Medical Protocols

{¶ 44} In the "Form Info" section of all three public-records requests for ODRC medical protocols, Teagarden chose "Education" in the category section and "Kite – Library" in the form section. The first of these kites was transmitted on June 29, the second kite was transmitted on July 5, and the third kite was transmitted on July 13. The kites are discussed below in this order.

{¶ 45} In the general details-of-request section, Teagarden wrote, "Provision of ODRC Medical Protocol B-1, Consultation Referral," "Provision of Medical Protocol B-11," and "Provision of ODRC Index of Medical Protocols." In the specific details-of-request section, which instructs, "**Please state the nature of your kite.  Be specific**," Teagarden wrote, "Please provide me with a copy of ODRC Medical Protocol B-1, Consultation Referral," "Please provide me with a copy of the ODRC Medical Protocol B-11," and "Please provide me with the index of all ODRC Medical Protocols." (Boldface in original.)

{¶ 46} Oshobe, an assistant librarian at the institution's library, closed all three kites. In closing the first kite, Oshobe wrote, "[Y]ou are in the library everyday, and you are even in the Law Library as [I] am responding to your kite. And you are in the general population. You can stop by the law [l]ibrary whenever you can to review 68-Med-01 to 24 to get the ODRC Medical Protocol that you are requesting." Oshobe closed the second kite by writing, "I need you to go back and

read my response to your kite on 06/29/2023 at 14:12pm." In closing the final kite, Oshobe wrote, "[T]he information you are requesting is in the main law library for inmates in general population." Oshobe sent this response to Teagarden three times in succession at 1:14, 1:18, and 1:31 p.m. on July 13.

### 2. Request for ODRC Policy Index

{¶ 47} In the "Form Info" section of his public-records request for the ODRC policy index, Teagarden chose "Education" in the category section and "Kite – Library" in the form section. The kite was transmitted on July 29.

{¶ 48} In the general details-of-request section, Teagarden wrote, "Provision of ODRC Policy Index." In the specific details-of-request section, which instructs, "**Please state the nature of your kite. Be specific**," Teagarden wrote, "Mrs. Igwe, Please provide me with a copy of the ODRC Policy Index." (Boldface in original.)

{¶ 49} Igwe, the librarian at the institution with authority over the library and the law library, closed the kite and wrote, "A copy of updated ODRC policy index is available in the law library. All you need to do is ask the law library workers to give it to you to review whenever you are in the law library."

### 3. Requests for LexisNexis Computer-Terminals Sign-in Sheet

{¶ 50} In the "Form Info" section of both public-records requests for the August 24 and 25 sign-in sheet for the LexisNexis computer terminals, Teagarden chose "Education" in the Category section and "Kite – Library" in the Form section. Both kites were transmitted on August 26.

{¶ 51} In the general details-of-request section in both kites, Teagarden wrote, "Provision of a copy of the sign in / log sheet for the Lexis Nexis terminals on August 24th and 25th." In the specific details-of-request section, which instructs, "**Please state the nature of your kite. Be specific**," Teagarden wrote, "Mrs. Oshobe, . . . I'm demanding that you allow me to inspect and copy the August 24 and 25 sign in sheet for the Lexis Nexis terminals" and "Mrs. Igwe, . . . I'm

demanding that you provide me with a copy of the sign in-log sheet for August 24 and 25." (Boldface in original.)

**{¶ 52}** Oshobe closed the first kite writing, "As for the sign in sheet [that you] are requesting, it belongs to the library and we cannot give it to you. It's library property, it cannot be given to you or any other inmates." Igwe closed the second kite writing, "The law library sheet that you are asking for belongs to the library and we cannot give it to you. It's library property, we use it for our audit, and it cannot be given to inmates."

**{¶ 53}** After his requests for public records were denied, Teagarden had only one option: to file a petition for writ of mandamus. In support of his petition, Teagarden submitted a brief, a verification affidavit, and exhibits. Respondents also submitted a brief and the affidavits of Igwe, Oshobe, and Courtney Dean, acting unit-management chief at the institution.

### C. Teagarden's Affidavit

**{¶ 54}** Teagarden avers that he did not request to *inspect* public records; he requested to be provided *copies* of public records. Those requests, Teagarden states, were transmitted to two offices at the institution—namely, the recreation office and the library.

**{¶ 55}** According to Teagarden, ODRC administrative policies are not directly available to incarcerated persons: in order to access the index of ODRC medical protocols, particular ODRC medical protocols, and the ODRC policy index, an incarcerated person must ask library staff for copies of the materials. Library staff will then access the ODRC website, make copies of the materials, and provide the copies to the incarcerated person.

**{¶ 56}** Teagarden avers that he asked for a copy of the ODRC policy index from two incarcerated persons who serve as library workers but that his requests were denied. Because his requests were denied, he directed a public-records request for the ODRC policy index to Igwe. Teagarden states that he asked Igwe

for the record because he believed that as an employee of the institution, she was required to comply with the Public Records Act, R.C. 149.43, and that she would provide him with a copy of the index. Lastly, in response to Igwe's and Oshobe's messages indicating that the LexisNexis sign-in sheets are library property that cannot be given to inmates, Teagarden states that he did not ask Igwe and Oshobe to "give" him the actual LexisNexis sign-in sheets but that he requested *copies* of the sign-in sheets.

### D. Respondents' Affidavits

{¶ 57} Igwe avers that she has worked as the institution's librarian for more than 20 years and that her duties include ensuring that the "library adheres to all policies and procedures set forth by ODRC." Oshobe avers that her duties include assisting incarcerated persons with obtaining "[i]nter-[l]ibrary loan materials from outside the library," "directing them to the law library" if they want to "review or make copies of the ODRC Administrative Rule and Policies," and assisting them in "searching for reading materials and making photocopies of both educational and [l]egal documents."

{¶ 58} Igwe and Oshobe admit that if an incarcerated person wants to make copies of materials, the incarcerated person must ask library staff. Specifically, if an incarcerated person in the "general population" of the institution wants to make copies of materials, the incarcerated person is required to show the library staff what he wants to copy. If the library staff approves, "the document will then be photo copied." Igwe and Oshobe describe a similar procedure for obtaining copies in the law library. If an incarcerated person wants to make a photocopy while in the law library, he "must request . . . the copy, if the copy of the material that [he] need[s] is on the computer" and he "must fill out a cash withdrawal slip, and the copies will be made after verifying from the cashier's office that [he] has the necessary funds to cover the cost of the copies." If he wants to make a photocopy

16

of a "readily available document," he must purchase a copy card at the commissary and the card will be used to make copies for him.

{¶ 59} Igwe and Oshobe further aver that ODRC administrative rules and policies and the ODRC policy index are available in the law library. If an incarcerated person wants a copy of the ODRC administrative rules and policies, he brings the material to the library staff "and the copies will be made." And incarcerated persons may "request copies of ODRC medical protocols any time they are in the library."

{¶ 60} Dean, the acting unit-management chief at the institution, serves as the back-up public-information officer for the institution and responds to incarcerated persons' "public records requests in compliance with O.R.C. 149.43 and ODRC Policy 07-ORD-02." Dean avers that incarcerated persons at the institution are instructed to direct public-records requests to the warden's administrative assistant. Dean attached a copy of ODRC Policy 07-ORD-02 to her affidavit.

## II. LAW AND ADMINISTRATIVE POLICIES

{¶ 61} Before addressing whether Teagarden transmitted proper public-records requests and whether the public office or person responsible for the public records improperly denied the requests pursuant to the requirements of the Public Records Act, it is important to get the law right.

{¶ 62} The State argues that an incarcerated person must direct a public-records request to the records custodian or the institution's public-information officer. But that is *not* the law in Ohio, and it is also contrary to ODRC's administrative policies.

### A. Ohio's Public Records Act

{¶ 63} The General Assembly has defined "[p]ublic office" as including "any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the

exercise of any function of government." R.C. 149.011(A). "State agency" is defined as including "every department, bureau, board, commission, office, or other organized body established by the constitution and laws of this state for the exercise of any function of state government, including any state-supported institution of higher education, the general assembly, any legislative agency, any court or judicial agency, or any political subdivision or agency of a political subdivision." R.C. 149.011(B).

**{¶ 64}** The legislature separately defined "[p]ublic official" as including "all officers, employees, or duly authorized representatives or agents of a public office." R.C. 149.011(D).

**{¶ 65}** With exemptions not relevant here, the General Assembly has defined "[p]ublic record" as "*records kept by any public office*, including, but not limited to, state, county, city, village, township, and school district units." (Emphasis added.) R.C. 149.43(A)(1). "Records" includes "any document . . . created or received by or coming under the jurisdiction of any public office . . . , which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." R.C. 149.011(G). The term "any" is often used to mean "all." *Wachendorf v. Shaver*, 149 Ohio St. 231, 239 (1948).

**{¶ 66}** When a requester transmits a public-records request to "a public office or person responsible for public records," the "public records responsive to the request shall be promptly prepared and made available for inspection to the requester at all reasonable times during regular business hours." R.C. 149.43(B)(1). If the public-records request is "ambiguous or overly broad" or "the public office or the person responsible for the requested public record cannot reasonably identify what public records are being requested, the public office or the person responsible for the requested public record may deny the request but shall provide the requester with an opportunity to revise the request by informing the requester of the manner

in which records are maintained by the public office and accessed in the ordinary course of the public office's or person's duties." R.C. 149.43(B)(2). If the public office or the person responsible for the public record denies the request, "in part or in whole," the public office or the person responsible for the public record "shall provide the requester with an explanation, including legal authority, setting forth why the request was denied." R.C. 149.43(B)(3).

{¶ 67} When the Public Records Act was originally enacted, only the "person responsible for public records" was required to "make copies available at cost." Am.Sub.H.B. No. 187, 130 Ohio Laws, Part I, 155, 1644; *see also Berry*, 2024-Ohio-5774, at ¶ 55 (Kennedy, C.J., concurring in part and dissenting in part). In 1999, however, the General Assembly amended the statute to include its current disjunctive language "public office or person responsible for public records shall make copies available at cost." Former R.C. 149.43(B)(1); Am.Sub.S.B. No. 78, 148 Ohio Laws, Part IV, 8623, 8625; *see also Berry* at ¶ 58 (Kennedy, C.J., concurring in part and dissenting in part). The "'use of the word 'or,' a disjunctive term, signifies the presence of alternatives.' " *Id*. at ¶ 49 (Kennedy, C.J., concurring in part and dissenting in part), quoting *In re Estate of Centorbi*, 2011-Ohio-2267, ¶ 18. It expresses the existence of a choice between two mutually exclusive possibilities; only one of the two requirements needs to be satisfied. *See generally* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives" [emphasis in original]).

{¶ 68} As this court explained long ago, "[t]he question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." *Slingluff v. Weaver*, 66 Ohio St. 621 (1902), paragraph two of the syllabus. And "'we may not restrict, constrict, qualify, narrow, enlarge, or abridge the General Assembly's wording.' " *Dillon v. Farmers Ins. of Columbus, Inc.*, 2015-Ohio-5407, ¶ 17, quoting *State ex rel. Carna v. Teays Valley Local School Dist. Bd.*

*of Edn.*, 2012-Ohio-1484, ¶ 18. Moreover, "[w]here a statute defines terms used therein which are applicable to the subject matter affected by the legislation, such definition controls in the application of the statute." *Terteling Bros. v. Glander*, 151 Ohio St. 236 (1949), paragraph one of the syllabus.

{¶ 69} Reread the definitions of "public office," R.C. 149.011(A), and "state agency," R.C. 149.011(B). "[T]he term 'include[s]' is not one of all-embracing definition but connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941), citing *Phelps Dodge Corp. v. Natl. Labor Relations Bd.*, 313 U.S. 177, 189 (1941). But the illustrative lists in R.C. 149.011 do not include any natural persons; they include only inanimate governmental bodies.

{¶ 70} In contrast, the legislature included natural persons in the illustrative list defining "public official": an "officer[], employee[], or duly authorized representative[] or agent[] of a public office." R.C. 149.011(D). Therefore, because the illustrative lists defining "public office" and "state agency" do not contain "public official," a public official cannot be considered as representative of the first part of the provision's disjunctive: "public office." *See* R.C. 149.011(A) and 149.43(B)(1). Because a public official is not a public office, a prison's public-information officer can only be considered as representative of the second part of the provision's disjunctive: "person responsible for the public record," *id*.

{¶ 71} The Public Records Act speaks in all-encompassing terms and in mandatory terms. And when a requester transmits a public-records request to either a public office or a person responsible for a public record, both "entities . . . must respond to a public-records request: the public office itself or a person responsible for public records." *Berry*, 2024-Ohio-5774, at ¶ 49 (Kennedy, C.J., concurring in part and dissenting in part). And the response "shall" be promptly prepared. R.C. 149.43(B)(1).

20

{¶ 72} This court has held that "in statutory construction, the word 'may' shall be construed as permissive and the word 'shall' shall be construed as mandatory unless there appears a clear and unequivocal legislative intent that they receive a construction other than their ordinary usage." *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102 (1971), first paragraph of the syllabus. There is no language in R.C. 149.43 indicating that the General Assembly intended "shall" to be used in any way other than its ordinary, mandatory usage. "[I]t is the duty of this court to give effect to the words used [in a statute], not to delete words used or to insert words not used." *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50 (1988), paragraph three of the syllabus.

{¶ 73} "Whatever temptations the statesmanship of policy-making might wisely suggest, construction must eschew interpolation and evisceration. [A judge] must not read in by way of creation." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev., 527, 533 (1947).

{¶ 74} Neither the plain language of the Public Records Act nor ODRC's administrative policies support the majority's denial of the requested writ of mandamus in part.

*B. ODRC Policies*

{¶ 75} When Dean submitted her affidavit, she included a copy of ODRC's public-records policy. So, let's begin our discussion of ODRC's policies there.

**1. ODRC's Public-Records Policy**

{¶ 76} An ODRC public-records coordinator is "[a]n employee designated by the managing officer (typically their administrative assistant) to be responsible for the implementation and oversight of public records requirements, as set forth in [ODRC's public-records] policy and Ohio's public record law." ODRC, *Policy Definitions*, https://drc.ohio.gov/static/MyOhio/Policies/Policy%20Definitions/Policy%20Definition%20Spreadsheet%20-%20Intranet%202021.pdf (last accessed Nov. 25, 2024) [https://perma.cc/SE8P-62MH]. "It is the policy of

[ODRC] to make available to requesting persons, organizations, and agencies *any records* that are considered public records." (Emphasis added.) ODRC, *Public Records Policy 07-ORD-02*, Section V, https://drc.ohio.gov/wps/wcm/connect/gov /914ba683-3360-4a15-afd2-e5171c1030cb/07-ORD-02+%284-2021%29.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWOR KSPACE.Z18_JQGCH4S04P41206HNUKVF31000-914ba683-3360-4a15-afd2-e5171c1030cb-oaJwopl (last accessed Nov. 25, 2024) [https://perma.cc/DQ42-39YX].

{¶ 77} Generally, it is the responsibility of an ODRC public-records coordinator to "manage public records requests" and "be responsible for *overseeing compliance* with the requirements set forth in [ODRC's public-records] policy and Ohio's public record law." (Emphasis added). *Id.* at Section VI.A.1. The "use of the phrase 'overseeing compliance' contemplates that employees other than the public-records coordinator will sometimes be called upon to respond to public-records requests." *Berry*, 2024-Ohio-5774, at ¶ 52 (Kennedy, C.J., concurring in part and dissenting in part). And the ODRC public-records policy dictates that "*all* ODRC personnel should familiarize themselves with records considered 'public' and 'non-public' by ODRC. (Emphasis added.) ODRC Public Records Policy, 07-ORD-02, at Section VI.A.2.

{¶ 78} The ODRC public-records policy dictates how records are to be maintained and organized. "Records, and copies thereof, that are considered public, *shall be made available at the office or institution where the records are maintained*." (Emphasis added). *Id.* at Section VI.B.1. "Each office or institution" is required to organize and maintain records "in a manner that serves both their administrative needs and the *public's interest* in the availability of those records for inspection and copying." (Emphasis added.) *Id.*

{¶ 79} An ODRC public-records coordinator is also responsible for "manag[ing] the processing of public record requests and arrang[ing] for an area to

22

accommodate in-person inspection." *Id.* A coordinator approves the material that is "to be inspected or copied and keep[s] a written record of each request and response thereto." *Id.* The ODRC public-records policy also provides that "[a]nnouncements regarding the availability of public records shall be posted in *areas accessible to the public*." (Emphasis added.) *Id.* at Section VI.B.2.

**{¶ 80}** The ODRC public-records policy then establishes the process of how to evaluate a request for a public record, when a public record is required to be made available, the process for redacting or withholding a public record, how to evaluate the length of time necessary to collect the record and respond, and what staff should participate in the preparation of the record to be released. Finally, the policy cautions that there are "legal and non-legal consequences [for] failing to timely or properly respond to a public record request" and explains the calculation of costs allowable when providing a public record.

**{¶ 81}** There are five key takeaways from ODRC's public-records policy. First, incarcerated persons are not addressed by the policy. Yes, the policy expresses that it is ODRC's policy to make available to requesting persons any records that are considered public, but it requires only that public records be posted "in *areas accessible to the public*." (Emphasis added.) *Id.* at Section VI.B.2.

**{¶ 82}** Second, the ODRC public-records policy establishes that *any* public record is to be made available to a requesting person. Third, the policy instructs institution staff to organize and maintain records in their offices to "serve[] both their administrative needs and the *public's interest* in the availability of those records for inspection and copying." (Emphasis added.) *Id.* at Section VI.B.1. Fourth, the policy establishes that records "shall be made available at the office or institution where the records are maintained." *Id.* Lastly, the policy does not dictate or explain how the staff of an ODRC institution invokes the role of the public-records coordinator.

**{¶ 83}** While Dean avers that incarcerated persons at the institution are required to transmit their public-records requests to the warden's administrative assistant, the State argues and the majority holds that an incarcerated person must transmit a request for public records to a facility's public-information officer. So, let's see what the public-information officer does and which ODRC policies control the work of the public-information officer.

### 2. ODRC's Media and Public-Relations Policies

**{¶ 84}** An ODRC institution's public-information officer serves out of the facility's office of communications and is defined as "[t]he employee who has been designated by the managing officer and approved by the Communications chief to handle public information duties for that facility. ODRC, *Policy Definitions*, https://drc.ohio.gov/static/MyOhio/Policies/Policy%20Definitions/Policy%20Defi nition%20Spreadsheet%20-%20Intranet%202021.pdf (last accessed Nov. 25, 2024) [https://perma.cc/SE8P-62MH]. ODRC polices 01-COM-09, 01-COM-12, and 01-COM-13 are controlling.

**{¶ 85}** ODRC policy 01-COM-09 refers to R.C. 5120.01 and states that the purpose of the policy is to "establish general guidelines for working with the media, rules for news media interviews with offenders, and a media notification system for all areas of [ODRC]". ODRC, *Media Policy* 01-COM-09, Sections I and II, https://drc.ohio.gov/wps/wcm/connect/gov/e92ef0eb-3cb4-41e2-a542-29ebf8d4d556/01-COM-09.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO1F56-e92ef0eb-3cb4-41e2-a542-29ebf8d4d556-oHo1OgV (last accessed Dec. 2, 2024) [https://perma.cc/7M5N-U69V]. Compare that to policy 01-COM-12, which refers to the same provision of the Revised Code but states, "The purpose of this policy is to establish guidelines for promoting information and events regarding [ODRC] both internally and within the community. This policy will ensure that accurate and timely information is presented on behalf of ODRC in the form of

video productions, publications, brochures, speaking engagements, etc." ODRC, *Public Relations Policy* 01-COM-12, Sections I and II, https://drc.ohio.gov/wps/wcm/connect/gov/8288a68a-d0bb-4cac-9f55-5f664fae96b3/01-COM-12.pdf?MOD=AJPERES&CONVERT_TO =url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO1F5 6-8288a68a-d0bb-4cac-9f55-5f664fae96b3-oS.L48T (last accessed Dec. 2, 2024) [https://perma.cc/97W5-LZNK]. And policy 01-COM-13 establishes "guidelines for working with the media in relation to incarcerated persons (IPs) on death row." ODRC, *Media Policy Death Row and Executions* 01-COM-13, Section II, https://drc.ohio.gov/wps/wcm/connect/gov/0a6fb636-d096-4ded-b1a4-6712a812ba37/01-COM-13.pdf?MOD=AJPERES&CONVERT _TO=url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO 1F56-0a6fb636-d096-4ded-b1a4-6712a812ba37-oJ874L6 (last accessed Dec. 2, 2024) [https://perma.cc/LUR4-75F8]. Plainly, none of these polices control the production of documents in response to a public-records request.

{¶ 86} None of these ODRC media policies designate a facility's public-information officer as the person responsible to manage or oversee compliance with a public-records request transmitted by an incarcerated person.

### III. ANALYSIS

{¶ 87} Prior to addressing the merits of Teagarden's petition for a writ of mandamus, it is important to understand what types of records he requested and whether those records are public records and to address the lack of candor shown by respondents in their answer and merit brief.

*A. The Nature of Teagarden's Public-Records Requests*

{¶ 88} Respondents neither aver nor claim that the records Teagarden requested are not public records as defined in R.C. 149.43 or that they are "non-public" records as that phrase is used in ODRC's public-records policy. The records Teagarden requested are the institution's recreation schedules, the

administrative policies of ODRC, and a sign-in sheet for the law library's LexisNexis computer terminals at the institution.

{¶ 89} All these records are considered public records as defined in the Public Records Act because they are documents kept by, created by, and under the jurisdiction of ODRC and "they serve[] to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office," R.C. 149.43(A)(1) and 149.011(G).

{¶ 90} The institution's recreation schedules show the list of activities that incarcerated persons may participate in. The index of ODRC medical protocols and ODRC medical protocols "B-1, Consultation Referral" and B-11 explain ODRC's medical policies regarding the medical treatment of incarcerated persons. The ODRC policy index is a list of all ODRC administrative policies, and the LexisNexis sign-in sheet documents computer access in the institution's law library. Therefore, all the records Teagarden requested are public records.

*B. Respondents' Answer and Merit Brief*

{¶ 91} Respondents in this case show the same lack of candor that the respondents showed in *Berry*. In respondents' answer, they plead various affirmative defenses—for example: (1) there is "no clear legal duty" to provide documents that a requester already had access to, (2) Teagarden failed to "pay in advance any charge or fee" (even though he was never asked to pay in advance for a copy of the record), and (3) respondents have made available "all existing public records" (when no records have been provided). Respondents also allege that the responses to the kites provided authority for why records were not being provided, that the records Teagarden requested are exempt as records pertaining to inmates under R.C. 5120.21, and that all the records requested are exempt under R.C. 149.43. In addition, respondents assert that "[Teagarden] failed to allege that he delivered his requests to the person responsible under R.C. 149.43(B)," that he "did not fairly or properly describe the records he sought," and that the "[r]ecords

responsive to [his] request do not exist," even though respondents provided a copy of the LexisNexis computer-terminals sign-in sheet. Then respondents make allegations against Teagarden. For example, they claim that he wanted respondents to "create a new document," that he had an "inability and or refusal to pay for the requested records," and that he "did not attempt to cooperate with Respondents [to] attempt to clarify his request in [an] effort to successfully comply with [his] overbroad request."

{¶ 92} The lack of candor continues in respondents' merit brief. Respondents argue there that Teagarden is not entitled to a writ of mandamus because he "failed to prove delivery to the proper records custodian or Public Information Officer." That argument fails for three reasons.

{¶ 93} First, the argument runs contrary to the evidence submitted by Dean. Dean avers that incarcerated persons at the institution are instructed to direct public-records requests to the warden's administrative assistant, but respondents presented no evidence showing that the warden's administrative assistant is the public-information officer for the institution.

{¶ 94} Second, respondents rewrite the Public Records Act. As outlined above, a "public official" is not included in the definitions of "public office" or "state agency." Therefore, the public-information officer, a "public official" at the institution, does not supplant the term "public office." Respondents may say that the public-information officer has been designated as the "person responsible for the records" of the institution. But that is not what ODRC policies provide.

{¶ 95} But Teagarden's public-records requests and requested writ of mandamus should not be denied for the reason that five of his public-records requests went to a "public office" and three went to the "person responsible for the records"—i.e., the named librarians. Furthermore, the affidavits of Teagarden, Igwe, and Oshobe all state that the library workers must provide copies of the administrative policies to incarcerated persons.

**{¶ 96}** Respondents also argue that Teagarden is not entitled to copies of certain public records he requested because he already had access to the records by some other means. Respondents do not support this argument with any legal authority, and there is no provision in R.C. 149.43 to support the statement.

**{¶ 97}** This opinion now turns to the merits of Teagarden's petition for a writ of mandamus. As explained below, Teagarden is entitled to the writ he has requested.

### C. Writ of Mandamus as to Recreation-Office Requests

**{¶ 98}** Teagarden transmitted two public-records requests—one in July 2023 and one in August 2023—to the institution's recreation office asking for a copy of the recreation schedules for all units. The majority holds that Teagarden is not entitled to a writ of mandamus compelling production of these documents because there is no "clear and convincing evidence that Handley violated the Public Records Act" in the sense that there was insufficient evidence that "Handley or the recreation office created or maintained the schedules," majority opinion, ¶ 14. The majority's decision is flawed for two reasons.

**{¶ 99}** First, there is no requirement under the current version of the Public Records Act that a requester of a public record submit his or her request to the "public official" who created or maintains the public record. *See* R.C. 149.011(D) and R.C. 149.43. The General Assembly amended R.C. 149.43 in 1999 to its current disjunctive "public office *or* person responsible for the public record." (Emphasis added.) R.C. 149.43(B)(1); Am.Sub.S.B. No. 78, 148 Ohio Laws, Part IV, 8623, 8625; *see generally Berry* at ¶ 58 (Kennedy, C.J., concurring in part and dissenting in part).

**{¶ 100}** R.C. 149.43(B)(1) also provides language specifying when a duty arises under the Public Records Act—i.e., "upon request by any person," which is followed by "a public office *or* person responsible for public records shall . . . ." (Emphasis added.) Therefore, both a public office and the person responsible for a

public record have a responsibility to respond to a public-records request. *See Berry* at ¶ 50 (Kennedy, C.J., concurring in part and dissenting in part).

{¶ 101} Once a request for a public record is transmitted to a public office, a "public official" must then "provide the record, provide the record with redactions of material that is exempt from disclosure, seek clarification because the request was for unidentifiable material, or deny the request." *State ex rel. Ware v. Wine*, 2022-Ohio-4472, ¶ 45 (Kennedy, C.J., concurring in part and dissenting in part). Under Ohio's current law, who the creator of the record is and who maintains the record are irrelevant.

{¶ 102} Go back and review Teagarden's public-records requests; in this case, Handley told Teagarden not only how often the institution's recreation schedules are posted but also where they are posted. In my view, there is no appreciable difference between the facts of this case and the facts of *State ex rel. Clark v. Dept. of Rehab. & Corr.*, 2024-Ohio-770.

{¶ 103} In *Clark*, the relator, Thomas Clark, transmitted an electronic kite to Ron Watts, a commissary and cashier supervisor at Lebanon Correctional Institution, requesting a paper copy of the commissary price list for each commissary window. Watts did not provide the lists but instead provided a location where the lists could be found, stating, "'These were put on J Pay so you can get pricing there.'" *Id.* at ¶ 2. Later that day, Clark replied that he wanted paper copies and Watts wrote back, "The list is being sent back out through J Pay." *Id.* This court concluded that "[t]he electronic correspondence that Clark submitted shows that the commissary department maintains and sends out the price lists." *Id.* at ¶ 14.

{¶ 104} Second, the majority misconstrues the evidence, because Teagarden did not transmit his public-records requests to Handley; Handley's name does not appear in Teagarden's records requests. Instead, Teagarden transmitted his requests to the institution's recreation office, a "public office" under the Public

Records Act. Handley just happened to be the employee in the recreation office—i.e., the "public official"—who responded to the requests.

{¶ 105} If, under ODRC's public-records policy, Handley lacked authority to respond to Teagarden's requests for public records, then Handley should have advised the appropriate "public official" at the institution. While I recognize that ODRC's public-records policy requires the public-records coordinator to oversee the "processing of public record requests," ODRC Public Records Policy, 07-ORD-02, at Section VI.B.1, that administrative policy cannot enlarge, abridge, or modify the Public Records Act. Once Handley chose to respond on behalf of ODRC, she was required to follow the law as outlined in R.C. 149.43(B)(1) and described with clarity in ODRC's public-records policy.

{¶ 106} Handley did not tell Teagarden that the requests for records were "ambiguous or overly broad" or that she could not "reasonably identify what public records [were] being requested." R.C. 149.43(B)(2). Similarly, Handley did not tell Teagarden that his requests for the institution's recreation schedules were being denied because the records were "non-public," ODRC Public Records Policy, 07-ORD-02, at Section VI.E, or did not exist. Handley simply denied Teagarden's records requests because the schedules were posted in the units and gym.

{¶ 107} While Dean avers that incarcerated persons at the institution "are instructed to direct public records requests to the Warden's Administrative Assistant," Dean provided no evidence of that policy and did not explain how incarcerated persons are given that instruction. According to ODRC's public-records policy, the availability of public records is advertised only in areas accessible by the public. And the ODRC media policy relates only to establishing guidelines for working with the media, promoting ODRC information and events, and working with the media concerning incarcerated persons on death row.

### D. Writ of Mandamus as to Library Requests

### 1. Requests for ODRC Medical Protocols

### a. ODRC Medical Protocols "B-1, Consultation Referral" and B-11

{¶ 108} The majority also holds that Teagarden is not entitled to a writ of mandamus to compel production of the ODRC medical protocols "B-1, Consultation Referral" and B-11 because Teagarden's requests were ambiguous and neither his brief nor his evidence indicate otherwise. For three reasons, I conclude that the majority misses the mark on this issue.

{¶ 109} First, let's get the law right. Under R.C. 149.43(B)(2), if a public-records request is ambiguous, the public office or the person responsible for the public record may deny the request but still must provide the requester with an opportunity to revise the request. If the public office or the person responsible for the public record ultimately denies the request, "in part or in whole, the public office or the person responsible for the requested public record shall provide the requester with an explanation, including legal authority, setting forth why the request was denied." R.C. 149.43(B)(3).

{¶ 110} Read the kites. Oshobe did not advise Teagarden that his requests for ODRC medical protocols were ambiguous or that she did not understand them. She simply told him to get the records himself when he went to the institution's library. In response to Teagarden's first request, Oshobe wrote, "You can stop by the law [l]ibrary whenever you can to review 68-Med-01 to 24 to get the ODRC Medical Protocol that you are requesting." In response to Teagarden's second request, Oshobe wrote, "Teagarden, I need you to go back and read my response to your kite on 06/29/2023."

{¶ 111} If Oshobe believed that Teagarden's requests for ODRC medical protocols were ambiguous, it was incumbent on Oshobe to deny the requests, tell him that she was denying them because they were ambiguous, and give him an

opportunity to revise them. This is not only consistent with R.C. 149.43; it is also consistent with ODRC's public-records policy.

{¶ 112} ODRC's public-records policy explicitly states what ODRC staff is to do if confronted with an ambiguous request for a public record. "[T]he requester must specifically identify the requested records with enough clarity to allow staff to identify, retrieve, and review the records. If it is not clear what records are being sought, staff shall ask the requester for clarification, and assist the requester in revising the request by informing the request[e]r of the way the *office* maintains its records." (Emphasis added.) ODRC Public Records Policy, 07-ORD-02, at Section VI.C.1. Oshobe failed to do that, and that failure alone was a violation of the Public Records Act.

{¶ 113} Second, where does the evidence indicating that Teagarden's requests for ODRC medical protocols were ambiguous come from? Read Oshobe's affidavit. Oshobe does not aver that Teagarden's requests were ambiguous or that she did not understand them. She states, "Teagarden, in the kites that he sent me regarding the requests at issue in his lawsuit, *did not identify his request for copies of various policies and documents as public records requests*." (Emphasis added.) "[Incarcerated persons] can request copies of ODRC medical protocols any time they are in the library." So what is there for Teagarden to refute? The majority correctly holds that a public-records request is not required "to use particular language in order to invoke the Public Records Act." Majority opinion at ¶ 20. Yet the majority does not apply its own statement of the law to the facts of this case.

{¶ 114} Third, the majority points out that the ODRC policy numbers Teagarden referred to do not correspond to the policy numbers Oshobe wrote in her response to Teagarden, but the majority is purposely misreading Teagarden's requests. Teagarden requested a copy of ODRC medical protocol "B-1, Consultation Referral," and ODRC medical protocol B-11. While the majority thinks that this is vague, it is plain that Oshobe did not. She knew exactly what

records Teagarden had requested, so respondents' claim that those requests were ambiguous is nothing more than a post hoc rewrite of history.

{¶ 115} Moreover, what is perhaps most disturbing about the majority's refusal to compel production of the requested ODRC medical protocols is that Teagarden, Igwe, and Oshobe all agree that the requested protocols are not physical records that inmates can access in the law library but, rather, are accessible on the ODRC's website, which is not available to incarcerated persons. As stated in the response Teagarden received to the March 2024 kite he sent to the warden's office and as admitted by Igwe and Oshobe, ODRC administrative rules and policies are available in the law library and upon request, library staff makes copies; the same is not true for the medical protocols.

### b. Index of ODRC Medical Protocols

{¶ 116} The majority holds that Teagarden is not entitled to a writ of mandamus compelling production of the index of all ODRC medical protocols for two reasons. First, the majority says that neither the librarian nor the assistant librarian is the "custodian of, or the person responsible for, every record or other material in the library." Majority opinion at ¶ 19. Second, the majority concludes that a requester must make clear that he is seeking a public record and not merely asking for assistance to find something in the library. The majority's decision, however, defies the law and the evidence.

{¶ 117} Let's start with the law. There is no dispute that ODRC is a public office, R.C. 149.011(A), or that ODRC's own policies are public records. R.C. 149.43(A)(1) and 149.011(G).

{¶ 118} Before submitting his evidence in this case, Teagarden transmitted to the warden's office a kite asking whether he could obtain a copy of ODRC policies from the institution's library. The warden's staff person who replied to the kite told Teagarden without equivocation that copies of ODRC policies were available from the library.

{¶ 119} Igwe and Oshobe agree that ODRC medical protocols are available to request at any time in the institution's library. The majority is simply wrong when it treats the ODRC medical protocols and the ODRC policy index, specifically addressed below, as simply reading materials. These are undeniably public records—they are records that document the protocols and policies of ODRC. Those records are kept in a public office, either in the institution itself or in the institution's library. While Igwe's affidavit is a little bit ambiguous about whether there are physical copies of the medical protocols in the library, to the extent that those records are available in the library, the librarians are as responsible for maintaining them as they are for other library materials in circulation. But even if these documents are accessible only by the librarians, the librarians are agents of a public office and they have a duty to respond on behalf of that public office.

{¶ 120} So, the majority's decision that a public official employed in the institution's library is not the person responsible for ODRC administrative rules and policies is beyond the pale. What is most troubling about the majority's opinion is that the warden's office staff person told Teagarden that he could obtain copies of ODRC policies in the library and Igwe and Oshobe admit that if an incarcerated person wants a copy of the ODRC administrative rules and policies or medical protocols, only library staff can make the copies.

{¶ 121} Lastly, as to the majority's holding that Teagarden had to make "clear" that he was requesting a public record rather than merely asking for a librarian's assistance in finding a record, majority opinion at ¶ 20, the kite he transmitted on June 29 could not have been clearer. In the general details-of-request section, Teagarden wrote, "Provision of ODRC Index of Medical Protocols." In the specific details-of-request section, he wrote, "Please provide me with the index of all ODRC Medical Protocols." Nothing in this request indicated that Teagarden was merely asking for assistance in locating a record. He knew

exactly where it was—in the institution's library. That is why he sent the public-records request to the library.

### 2. Request for ODRC Policy Index

{¶ 122} Teagarden avers that after the two library workers denied his request for a copy of the ODRC policy index, he transmitted a public-records request to Igwe requesting a copy of the ODRC policy index. Igwe responded to Teagarden's request by informing him that when visiting the law library, he should ask the library workers for it.

{¶ 123} The majority holds that Teagarden is not entitled to a writ of mandamus compelling production of the ODRC policy index because asking for a "'copy' does not make clear" that his request for the ODRC policy index was a public-records request. Majority opinion at ¶ 21. The only suitable response to that is, "Is this a joke?"

{¶ 124} In the paragraph of the majority opinion prior to this conclusion, the majority holds, "A public-records request does not need to use particular language in order to invoke the Public Records Act." Majority opinion at ¶ 20. The majority then cites a plurality opinion of this court stating that the Public Records Act contains no provision that requires a requester to label a public-records request as a "formal public records request." *Id.*, quoting *State ex rel. Ware v. Dept. of Rehab. & Corr.*, 2024-Ohio-1015, ¶ 15-16. Okay, so if a public-records request is not required to use some magical statement that "this is a request of public records" and if the word "copy" is insufficient to clarify that a requester is asking for a copy of a public record, then what word would be clear? How about *replicate* a record or *duplicate* a record or *clone* a record or *photocopy* a record? Teagarden's specific request was, "Mrs. Igwe, Please provide me with a copy of the ODRC Policy Index." As used here, what else could the word "copy" mean?

{¶ 125} The majority grants a writ of mandamus compelling production of the requested LexisNexis computer-terminals sign-in sheet. The language of

Teagarden's requests was, "I'm demanding that you allow me to inspect and copy the August 24 and 25 sign in sheet for the Lexis Nexis terminals" and "I'm demanding that you provide me with a copy of the sign-in log sheet for August 24 and 25." So if the word "copy" is enough there, how is the word "copy" insufficient in Teagarden's request for the ODRC policy index? ODRC's public-records policy explicitly provides that Ohio's public-records law "does not require specific language." ODRC Public Records Policy, 07-ORD-02, at Section VI.C.1.

{¶ 126} For all the foregoing reasons, I would grant Teagarden's petition for a writ of mandamus in full and order respondents to provide copies of the institution's recreation schedules in existence on July 11 and August 7, 2023, the index of all ODRC medical protocols, the ODRC medical protocols "B-1, Consultation Referral" and B-11, and the ODRC policy index.

### E. Statutory Damages

{¶ 127} I agree with the majority's statement of the law on statutory damages until it states that "[w]hen a requester makes multiple requests to the same office on the same day concerning the same general subject matter, the requester is entitled to only a single statutory-damages award, not an award for each record requested." Majority opinion at ¶ 27, citing *State ex rel. Ware v. Parikh*, 2023-Ohio-2536, ¶ 31. As I explained in *Ware*, transmission of a public-records request controls the amount of statutory damages to be awarded in an action filed under the Public Records Act. *Id*. at ¶ 41 (Kennedy, C.J., concurring in part and concurring in judgment only in part). "When calculating statutory damages, the general content of the public-records request does not matter." *Id.* at ¶ 50 (Kennedy, C.J., concurring in part and concurring in judgment only in part). "When calculating statutory damages, what matters—and what *is* tied to the statutory language—is whether the public-records requests were made in the same transmission, i.e., in the same envelope or email." (Emphasis in original.) *Id*. at ¶ 51 (Kennedy, C.J., concurring in part and concurring in judgment only in part).

{¶ 128} Because respondents violated the Public Records Act by willfully and wrongfully denying Teagarden's public-records requests, I would award him statutory damages in the amount of $8,000—$1,000 for each public-records request that Teagarden transmitted and for which the public office or person responsible for the public record failed to provide the responsive record and thereby denied the public-records request.

## IV. CONCLUSION

{¶ 129} Because Teagarden has proved by clear and convincing evidence that he transmitted eight public-records requests to the public office or person responsible for the public record and the public official responding to the requests failed to respond to the requests pursuant to law and provide the public records requested, I would grant in full the writ of mandamus requested by Teagarden. I would order respondents to produce, in addition to the August 24 and 25, 2023 LexisNexis computer-terminals sign-in sheet, copies of the institution's recreation schedules in effect on July 11 and August 7, 2023, the index of all ODRC medical protocols, the ODRC medical protocols "B-1, Consultation Referral" and B-11, and the ODRC policy index. I would also award Teagarden statutory damages in the amount of $8,000—$1,000 for each public-records request that he transmitted to the public office or person responsible for the public record that was improperly denied. Therefore, I concur in part and dissent in part.

_____

**DEWINE, J., joined by DETERS, J., concurring in part and dissenting in part.**

{¶ 130} I concur in the court's judgment to the extent that it denies a writ of mandamus as to the kites that relator, Trevor J. Teagarden, sent on July 11 and August 7, 2023, to the Pickaway Correctional Institution's ("PCI" or "the institution") recreation office and the kites he sent on June 29, July 5, July 13, and July 29, 2023, to the institution's library. I dissent from the court's judgment to the

extent that it grants a writ of mandamus as to the kites Teagarden sent on August 26, 2023, to the library and to the extent that it awards him statutory damages.

{¶ 131} In his August 26 kites, Teagarden asked two prison librarians for "a copy of the sign in / log sheet for the Lexis Nexis terminals on August 24th and 25th." The majority concludes that the librarians violated the Public Records Act, R.C. 149.43, by failing to fulfill this request and awards Teagarden statutory damages. But it does so without fully considering the plain language of the Public Records Act.

{¶ 132} Under the Public Records Act, "a public office or person responsible for public records" is required to make public records available upon request. R.C. 149.43(B)(1). A writ of mandamus and statutory damages are available if a person is "aggrieved by the failure of a public office or the person responsible for public records" to make those records available. R.C. 149.43(C)(1).

{¶ 133} Thus, to obtain a writ of mandamus, Teagarden must show that each of the two librarians to whom he directed his requests—respondents Nnacho Igwe and Atiboroko Oshobe—was either "a public office" or "the person responsible for public records." He has shown neither.

{¶ 134} A public office is defined to "include[ ] any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). Neither Igwe nor Oshobe qualifies as a public office under this definition.

{¶ 135} Nor has Teagarden shown that either librarian is "the person responsible for public records," R.C. 149.43(C)(1). Pursuant to state prison policy, *see* ODRC Policy 07-ORD-02, PCI has designated a public-records coordinator. Inmates at the institution are directed to submit public-records requests to the warden's administrative assistant. It is undisputed that the job duties of the two librarians do not include receiving or responding to public-records requests.

Instead, Teagarden's position seems to be that the librarians were responsible for public records merely because they had access to them.

{¶ 136} "In a public-records mandamus case, the relator bears the burden of showing his entitlement to the writ by clear and convincing evidence." *State ex rel. Griffin v. Sehlmeyer*, 2022-Ohio-2189, ¶ 9. Because Teagarden has failed to show that respondents Igwe and Oshobe are each a "public office" or "the person responsible for public records," we should deny the writ as to Teagarden's August 26 requests.

{¶ 137} This conclusion is in accord with previous decisions of this court in which we held that the Public Records Act is not violated when a relator is directed to the appropriate office to handle a public-records request. *See, e.g.*, *State ex rel. Frank v. Ohio State Univ.*, 2020-Ohio-3422, ¶ 11-12 (no violation of Public Records Act when requester was directed to the office responsible for public records); *State ex rel. Ware v. Wine*, 2022-Ohio-4472, ¶ 9 (lead opinion) (denying writ because evidence didn't establish that recipient of request was the records custodian or that the request was denied by referral to a different employee/office). The only difference between this precedent and the present case is that here, Teagarden was directed to the appropriate individual before he transmitted his request—that is, the inmates at PCI are told to direct their public-records requests to the warden's administrative assistant. Such a distinction is hardly dispositive— the key point is that in any case, a public-records request must be directed to the "public office" or "the person responsible for the public records."

{¶ 138} Because Teagarden has failed to establish as to his August 26 requests that he was "aggrieved by the failure of a public office or the person responsible for public records," R.C. 149.43(C)(1), I would deny the writ and deny statutory damages as to those requests. I therefore dissent from the court's judgment in those respects, but I concur in the rest of its judgment.

—————————————

Trevor J. Teagarden, pro se.

Dave Yost, Attorney General, and Andrew Gatti, Assistant Attorney General, for respondents.

_____