[This opinion has been published in *Ohio Official Reports* at 178 Ohio St.3d 544.]

THE STATE EX REL. BERRY *v.* BOOTH ET AL.

[Cite as *State ex rel. Berry v. Booth*, 2024-Ohio-5774.]

*Mandamus—Public-records requests—R.C. 149.43—Respondents' delay in providing requested documents was not unreasonable—Writ and statutory damages denied.*

(No. 2023-1163—Submitted July 23, 2024—Decided December 10, 2024.)

IN MANDAMUS.

————————————

The per curiam opinion below was joined by FISCHER, DEWINE, DONNELLY, STEWART, and DETERS, JJ. DEWINE, J., authored a concurring opinion, which DETERS, J., joined. KENNEDY, C.J., concurred in part and dissented in part, with an opinion joined by BRUNNER, J.

**Per Curiam.**

{¶ 1} Relator, Donny Berry, who was an inmate at the Trumbull Correctional Institution ("TCI") in August 2023, requests a writ of mandamus ordering the production of records responsive to several public-records requests. He also seeks an award of statutory damages and miscellaneous expenses. Respondents are TCI and Glenn Booth, the TCI public-information officer whose duties include responding to inmate public-records requests. Respondents have filed a motion for sanctions, and relator has filed a motion to compel the clerk of this court to accept his untimely response in opposition. We deny relator's request for a writ and for an award of statutory damages and miscellaneous expenses. We also deny relator's motion to compel and respondents' motion for sanctions.

## I. BACKGROUND

{¶ 2} Relator alleges that in August 2023, while an inmate at TCI, he submitted by electronic prison kite 17 public-records requests to various TCI departments and employees. Relator commenced this action in September 2023, alleging that he had been denied access to all the records he had requested.

{¶ 3} Relator alleges that he sent requests to various TCI departments and/or employees for copies of the following public records:

- the current bank statement for TCI's industrial and entertainment fund from the warden's office;
- the recreation music-room schedule from the recreation department;
- TCI's list of approved vendors from the mailroom;
- the unit laundry schedule from the laundry department;
- the electronic-forms catalog from the warden's office;
- TCI's grievance procedure from the inspector's office;
- the safe-cell inspection form from the mental-health department;
- TCI's current food menu from the food-service department;
- the Ohio Department of Rehabilitation and Correction master-forms list from the library; and
- body-camera footage from a specific corrections officer.

{¶ 4} Relator also alleges that he made the following public-records requests, but he does not identify the intended recipient for any of them:

- TCI's commissary schedule for August 2023;
- the open-office-hours schedule for mental health;
- the chapel activities calendar for August 2023;
- the form used to log the weekly rules infraction board ("RIB") rulings, the RIB chairman's job description and qualifications, and TCI's sanction chart;

2

- the local policy index; and

- the inmate-file document directory.

**{¶ 5}** Relator acknowledges that he sent only one of his requests directly to Booth: a request for copies of all electronic transmissions that relator sent by prison kite "between the dates of August 4th and August 27th." In all, relator claims to have submitted 17 separate public-records requests in August 2023. According to relator, all his requests were initially denied.

**{¶ 6}** Relator seeks a writ of mandamus compelling respondents to make the records he requested available to him. He additionally seeks an award of statutory damages for each violation and reimbursement for postage and photocopying. Also before us are respondents' motion for sanctions and attorney fees and relator's motion to compel the clerk of this court to accept his untimely response in opposition.

**{¶ 7}** We previously denied respondents' motion to dismiss, granted an alternative writ, and set a schedule for the submission of evidence and merit briefing. 2024-Ohio-51. Relator has submitted the following as evidence: (1) copies of documents that he received after filing his complaint, which are responsive to many of his requests, (2) copies of many of the prison kites by which he had made those requests, (3) an itemized list of the records that he has received and of the requests to which he has been notified that there are no responsive records, and (4) an affidavit averring that he has not received specific records that he requested and that he has been denied copies of some of his kites to submit as evidence of those requests. Respondents have submitted an affidavit by Booth as evidence. Attached to Booth's affidavit is an itemized list like the one provided by relator, except that it includes the signatures of relator and a witness. The affidavit documents that respondents adequately responded to all relator's requests.

## II. ANALYSIS

### A. Mandamus Claim

{¶ 8} Mandamus is an appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act. R.C. 149.43(C)(1)(b). To obtain a writ of mandamus, relator must show by clear and convincing evidence that he has a clear legal right to the requested relief and that respondents have a clear legal duty to provide it. *State ex rel. Cincinnati Enquirer v. Sage*, 2015-Ohio-974, ¶ 10. Relator bears the burden to plead and prove facts showing that he properly requested a record kept by a public office, that the public office had a clear legal duty to provide it, and that the public office failed to make the record available. *State ex rel. Ware v. Beggs*, 2024-Ohio-611, ¶ 11. "In general, providing the requested records to the relator in a public-records mandamus case renders the mandamus claim moot." *State ex rel. Toledo Blade Co. v. Toledo–Lucas Cty. Port Auth.*, 2009-Ohio-1767, ¶ 14.

### 1. Relator's public-records requests are not merely requests for information

{¶ 9} Respondents argue that they were not required to respond to relator's public-records requests, because they are merely requests for information. Relator wrote in each of his prison kites, "I would like to request a copy of [the documents]." This court has previously declined to sustain the argument that a public-records request must be formally labeled as such. *State ex rel. Ware v. Dept. of Rehab. & Corr.*, 2024-Ohio-1015, ¶ 15. The Public Records Act "contains no provision requiring that a requester formally label a public-records request as a 'formal public records request,' *see* R.C. 149.43(B), and a requester is generally not required to cite a particular rule or statute when making a request, *see State ex rel. Parker Bey v. Byrd*, 160 Ohio St.3d 141, 2020-Ohio-2766, 154 N.E.3d 57, ¶ 14." *Id*. at ¶ 16. "However, it must be clear that the requester is requesting a public record . . . ." *State ex rel. Teagarden v. Igwe*, 2024-Ohio-5772, ¶ 20. In this case, it was clear that Booth was requesting public records.

{¶ 10} "Upon request by any person, a public office or person responsible for

public records shall make copies of the requested public record available to the requester at cost and within a reasonable period of time." R.C. 149.43(B)(1). Respondents are required to provide relator with any public records that relator properly requested of them, regardless of whether the requests were formally labeled as public-records requests.

*2. Many of relator's public-records requests have been rendered moot*

**{¶ 11}** Booth avers that on October 13, 2023, he provided relator with "all responsive documents for his many requests for information that [relator] had sent to [respondents] via [relator's] electronic prison kites in August 2023." Booth further avers that relator did not identify any of his requests for information as a public-records request and did not deliver the requests to the public-information officer (i.e., Booth). Booth created an itemized list of all the documents that were provided to relator, and the list was signed by relator and a witness. This signed itemized list is attached to Booth's affidavit and documents that 14 records were provided to relator and that 3 requests had no responsive records.

**{¶ 12}** Relator also has submitted a copy of the itemized list, although his copy does not include any signatures. He has additionally submitted copies of documents responsive to many of his public-records requests and copies of specific prison kites by which he had made those requests. Both parties' copies of the itemized list further reflect that there are no records responsive to relator's requests for the electronic-forms catalog, body-camera footage, and the inmate-file document directory. Because all documents responsive to these requests have been provided to relator, this portion of his mandamus claim is rendered moot. *See State ex rel. Striker v. Smith*, 2011-Ohio-2878, ¶ 22; *Toledo Blade Co.*, 2009-Ohio-1767, at ¶ 14.

**{¶ 13}** Relator avers that Booth failed to provide him with copies of the prison kites for five of his requests for records. However, the evidence shows that the records have been produced to relator. Accordingly, the portion of his mandamus

claim requesting copies of the prison kites wherein he requested these records is also rendered moot. *See Striker* at ¶ 22.

### 3. Relator has not met his burden of persuasion

{¶ 14} Relator's mandamus claim is not moot as to his alleged request for a copy of the RIB chairman's job description and TCI's sanction chart. In his complaint, relator alleges that the request for these records was included with the request for the RIB disposition log. Relator bears the burden to plead and prove facts showing that he properly requested these documents and that respondents had a duty to make them available but did not. *Ware*, 2024-Ohio-611, at ¶ 11. He also bears the burden of persuasion to show his entitlement to a writ of mandamus by clear and convincing evidence. *Cincinnati Enquirer*, 2015-Ohio-974, at ¶ 10.

{¶ 15} Respondents have submitted evidence in the form of Booth's affidavit documenting that Booth discussed with relator his many requests for records to "obtain clarity on several of the requests," that Booth then provided relator with "all responsive records that he requested," and that relator signed the itemized list acknowledging his receipt with a witness present. Neither Booth's affidavit nor the signed itemized list mentions a request for the RIB chairman's job description or TCI's sanction chart.[1] Specific to this alleged request, relator has provided a kite reference number, the date of the request, and the date of the denial "by Lt. Scott." However, this request is one of the many made by relator in which he did not identify the intended recipient or produce a copy of the alleged kite. There is no allegation or evidence that relator transmitted this request either to Booth (i.e., the person at TCI "responsible for public records," R.C. 149.43(B)(1)) or to a "public office," *id*. In his affidavit, relator avers that Booth denied his request for a copy of this alleged kite to submit as evidence. However, relator also has not provided a copy of his request

---

1. Booth's affidavit appears to equate relator's request for the RIB disposition log with his request for TCI's sanction chart. However, there is a handwritten notation on the signed itemized list indicating that the "sanction grid" is "not . . . attached."

to Booth; nor has he stated in his affidavit that he sent the request to Booth. Berry thus has not contradicted Booth's affidavit, which attests that he provided documents responsive to an August 23, 2023 request for specific kites that Berry sent between August 4 and 27, 2023.

{¶ 16} Absent other supporting evidence, relator's affidavit is insufficient to meet his burden of showing that he requested the RIB chairman's job description and TCI's sanction chart from "a public office or the person responsible for public records." R.C. 149.43(C)(1). Because relator has not shown by clear and convincing evidence that he is entitled to a writ regarding this request, we deny this final portion of relator's mandamus claim.

### B. Statutory Damages and Miscellaneous Expenses

{¶ 17} A requester who transmits a "written request by . . . electronic submission" to "receive copies of any public record in a manner that fairly describes the public record" to the "person responsible for the requested public record" is entitled to recover statutory damages "if a court determines that . . . the person responsible for public records failed to comply with an obligation" under R.C. 149.43(B). R.C. 149.43(C)(2). Thus, a requester may be entitled to statutory damages even if a court denies his mandamus claim. *State ex rel. Ware v. Giavasis*, 2020-Ohio-3700, ¶ 10.

{¶ 18} One obligation under R.C. 149.43(B) is that the person responsible for the requested public records make copies available to the requester "within a reasonable period of time." R.C. 149.43(B)(1). What is "reasonable" depends on the pertinent facts and circumstances. *See State ex rel. Morgan v. Strickland*, 2009-Ohio-1901, ¶ 10.

{¶ 19} In this vein, relator contends that Booth's delay in responding to his requests caused him to suffer a "loss of use once the month of [A]ugust expired and he was transferred to another institution." The only requests that relator made specific to August were for the commissary schedule and the chapel activities

calendar. Booth produced documents responsive to these requests after relator filed this mandamus action. However, the record does not contain clear and convincing evidence that the documents were produced in response to a written request that relator transmitted to the "person responsible for the requested public records," as required by R.C. 149.43(C)(2). There is no evidence that relator transmitted these requests to Booth, the person responsible for public records at TCI, R.C. 149.43(C)(1), or to a "public office," *id.* The prison kites indicate that (1) on August 16, 2023, an "M. Armstrong" denied relator's August 12 request for the chapel activities calendar because the information was "posted" and (2) on August 11, 2023, an "F. Cimmento" responded to relator's August 9 request for the commissary schedule with, "[I]t is the 8:15am rec schedule." Relator does not identify the intended recipient of either request in his complaint or in his submission of evidence. Accordingly, relator has not satisfied his burden to demonstrate that he is entitled to statutory damages under R.C. 149.43(C)(2). *See State ex rel. Mobley v. Toledo*, 2022-Ohio-3889, ¶ 13-14.

{¶ 20} Moreover, Booth's delay in responding to relator's multiple other requests was not unreasonable. Relator allegedly transmitted 17 requests for records in August 2023, and all responsive documents were produced by October 13, 2023. Given the number of requests, this response period is not unreasonable. For these reasons, we deny relator's request for statutory damages.

{¶ 21} Relator also seeks an award to cover his expenses for postage and photocopying to file this action. R.C. 149.43(C)(3)(a)(1) authorizes awards of court costs, but these expenses are not court costs. *See Vossman v. Airnet Sys.,* 2020-Ohio-872, ¶ 6 (costs are the statutory fees that court officers are entitled to for their services). Therefore, relator is not entitled to reimbursement for these expenses.

## C. Motion to Compel

{¶ 22} Respondents filed a motion for sanctions on February 20, 2024, with a response due in the office of the clerk of this court by March 1, 2024. *See*

S.Ct.Prac.R. 4.01(B)(1). The clerk's office refused to file relator's response in opposition, under S.Ct.Prac.R. 3.02(B), because it was not received until March 14. Relator then filed a "motion to compel," by which he requests an order instructing the clerk's office to accept for filing his response in opposition to respondents' motion for sanctions. This is nothing more than a motion to waive application of S.Ct.Prac.R. 3.02(B), and such a motion is "prohibited and shall not be filed," *id*. We therefore deny relator's "motion to compel."

### D. Motion for Sanctions

**{¶ 23}** Under Civ.R. 11 and 54 and R.C. 2731.12, 2323.51(B), and 2969.22(A), respondents request an order taxing as costs to relator a sanction in the amount of $17,000 plus the expenses of this litigation, including attorney fees, and an order directing the clerk of this court to file an amended bill of costs. Counsel for respondents has submitted an affidavit in support of the request for attorney fees.

**{¶ 24}** Respondents assert that because relator "falsely and fraudulently" requested $17,000 in statutory damages, they are requesting $17,000 in sanctions "in an effort to deter Relator and other prison inmates from filing bogus mandamus Complaints that waste precious judicial and governmental resources." They contend that relator filed a public records mandamus action "to enforce a public records request that he never made." More specifically, respondents accuse relator of filing a fraudulently altered version of the itemized list of records by removing the signatures acknowledging that he had been provided all responsive documents and filing an affidavit of verity that falsely authenticates his version of the itemized list. Although relator has not met his burden to demonstrate that he is entitled to a writ, there is no evidence that he acted falsely or fraudulently in bringing this action. There is also no evidence (other than an affidavit in which respondents' counsel repeats the accusation) that relator altered the signed itemized list. Moreover,

relator does not dispute the authenticity of the signatures on respondents' version of the itemized list. For these reasons, we deny respondents' motion for sanctions.

### III. CONCLUSION

{¶ 25} We deny relator's request for a writ of mandamus and deny his request for an award of statutory damages and reimbursement for postage and photocopying. We additionally deny relator's motion to compel and respondents' motion for sanctions.

Writ denied.

_____

**DEWINE, J., joined by DETERS, J., concurring.**

{¶ 26} I concur in the majority's judgment. I write separately to point out a few of the flaws in the analysis of the opinion concurring in part and dissenting in part.

### *The Misreading of the Statute*

{¶ 27} The opinion concurring in part and dissenting in part begins with the premise that a person can simply ask any public employee for a document and then recover statutory damages for violation of the Public Records Act if the document is not produced. According to the opinion concurring in part and dissenting in part, "a joint duty arises for either the public office *or* a person responsible for public records to respond to it." Opinion concurring in part and dissenting in part, ¶ 51. In other words, in the view of the opinion concurring in part and dissenting in part, a person can simply ask *any* public employee for a document and then obtain a writ of mandamus and an award of statutory damages if the document is not produced.

{¶ 28} This reading ignores the plain text of the Public Records Act. Recall that under the act, "a public office or person responsible for public records" is required to make public records available upon request. R.C. 149.43(B)(1). A writ of mandamus and an award of statutory damages are available if the requester is

"aggrieved by the failure of a public office or the person responsible for public records" to make those records available. R.C. 149.43(C)(1).

{¶ 29} Under the reading of the statute by the opinion concurring in part and dissenting in part, a "public office" includes every employee of that office. It reaches this result despite the fact that "public office" is a statutorily defined term and nowhere are "employees" included in the definition. *See* R.C. 149.011(A) (a public office "includes any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government").

{¶ 30} The obvious problem with this approach is that it renders superfluous the statutory language "the person responsible for the public records," R.C. 149.43(C)(1). If the legislature had meant the term "public office" to include every person in that office, there would have been no need to include "the person responsible for the public records" in the statute. Thus, the reading by the opinion concurring in part and dissenting in part stands in tension with our long-standing principle that no part of an enactment "should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *State ex rel. Myers v. Rural School Dist. of Spencer Twp., Lucas Cty., Bd. of Edn.*, 95 Ohio St. 367, 373 (1917); *see generally* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 174-179 (2012).

{¶ 31} It doesn't take much imagination to grasp the problems with the interpretation found in the opinion concurring in part and dissenting in part. Under its view, a person could approach any employee of any state agency (say an election worker employed for the day by the secretary of state's office), ask for any public record belonging to the state agency (say the secretary of state's travel schedule), and then collect statutory damages if the document is not produced. The

unworkability of this reading is a sign that something is amiss with the opinion's interpretation of the statute.

{¶ 32} The opinion concurring in part and dissenting in part responds to this superfluity problem by pointing to another section of the statute, which uses the phrase "a person responsible for public records" rather than "the person responsible for public records." But it's hard to see how this helps its argument. If every employee of a public office is duty bound to respond to a public-records request as the opinion concurring in part and dissenting in part maintains, then the phrase "person responsible for public records" becomes superfluous, regardless of the article ("a" or "the") attached.

{¶ 33} Rather than rewrite the statute along the lines suggested by the opinion concurring in part and dissenting in part, we should simply apply its plain language. A writ of mandamus and statutory damages are available if a person is "aggrieved by the failure of a public office or the person responsible for public records." R.C. 149.43(C)(1). Thus, Berry was required to show that he directed his request either to "the person responsible for public records" or to the public office itself. *Id.*

### *Credibility Determinations*

{¶ 34} Aside from its flawed reading of the statute, the opinion concurring in part and dissenting in part chooses to deem Berry's evidence credible and Booth's affidavit not credible. It takes some surprising steps to reach its conclusion that Booth's affidavit should be disregarded.

{¶ 35} For one, it assesses the credibility of affidavit testimony without the benefit of an evidentiary hearing. *See* S.Ct.Prac.R. 12.10 ("The Supreme Court may refer original actions to a master commissioner for the presentation of

evidence, hearings, and oral argument.").[2]  "An affidavit, being by definition a statement that the affiant has sworn to be truthful, and made under penalty of perjury, should not lightly be deemed false."  *State v. Calhoun*, 1999-Ohio-102, ¶ 20.  For that reason, in a mandamus case in which no evidentiary hearing has been held, we typically do not weigh the credibility of competing affidavits.  *See, e.g.*, *State ex rel. Howson v. Edmonson*, 2024-Ohio-4619, ¶ 19 (concluding that because "the conflicting affidavits [we]re evenly balanced," the relator was not entitled to a writ); *State ex rel. Ware v. Giavasis*, 2020-Ohio-5453, ¶ 32 (same).[3]  That makes sense: absent an evidentiary hearing with the benefits of cross-examination and the opportunity to observe the demeanor of a witness, we are ill-equipped to assess the credibility of a witness based on a bare affidavit.

**{¶ 36}** Second, the opinion concurring in part and dissenting in part uses what it considers improper legal arguments by Booth and the assistant attorney general representing Booth in this action as evidence that Booth lied in his affidavit.  For example, it takes issue with assertions by Booth and his attorney characterizing Berry's requests as requests for information, rather than requests for public records.  Opinion concurring in part and dissenting in part at ¶ 121.  It may be that Booth's attorney advanced poorly thought-out legal arguments, but at most that shows that Booth's counsel was inadequate, not that Booth is a liar.

---

2. In support of its decision to find Booth's affidavit not credible, the opinion concurring in part and dissenting in part cites *Gillen-Crow Pharmacies, Inc. v. Mandzak*, 5 Ohio St.2d 201, 205 (1966) for the proposition that "as the trier of fact, each justice may believe or disbelieve, in whole or in part, the testimony presented to this court."  Opinion concurring in part and dissenting in part at ¶ 110. What the opinion neglects to mention is that the passage on which it relies refers to a trial court that has had the opportunity to "consider the demeanor of the witnesses and the manner in which they testify," *Gillen-Crow* at 205, not to a writ action in the Ohio Supreme Court where no evidentiary hearing has been held.

3. My position is not, as suggested by the opinion concurring in part and dissenting in part, that this court cannot weigh evidence in original actions.  Of course, we can weigh evidence.  But courts do not ordinarily disregard sworn affidavit testimony absent an opportunity to assess the credibility of the witness.

{¶ 37} Third, the opinion concurring in part and dissenting in part treats unsworn statements by Berry as evidence. For example, it says, "In his 'Explanation of Evidence' that is attached to the evidence he submitted in this case, Berry asserts that 'Warden Office faculty staff' denied the request . . . ." Opinion concurring in part and dissenting in part at ¶ 98. The problem is that Berry's "Explanation of Evidence" is not evidence at all. It is simply an unsworn statement. *See Paasewe v. Wendy Thomas 5 Ltd.*, 2009-Ohio-6852, ¶ 22 (10th Dist.) (unsworn statements are not evidence).

### *Conclusion*

{¶ 38} In its conclusion, the opinion concurring in part and dissenting in part charges, "Maybe members of this court think that incarcerated people are lesser citizens than people who are not incarcerated." Opinion concurring in part and dissenting in part at ¶ 148. In my experience, that's not true of any member of this court. What is true is that the same rules should apply to everybody. We should apply the Public Records Act as it is written, not twist its language and disregard established evidentiary standards to award $17,000 in damages that are not justified by law.

{¶ 39} I concur in the majority's disposition of this case.

_____

**KENNEDY, C.J., joined by BRUNNER, J., concurring in part and dissenting in part.**

{¶ 40} Relator, Donny Berry, transmitted 17 public-records requests via electronic kites to numerous offices and employees at respondent Trumbull Correctional Institution ("TCI"). Respondent Glenn Booth is the warden's assistant and says that he is TCI's public-information officer whose duties include responding to inmate public-records requests. I agree with the majority's decision to deny both Berry's motion to compel and respondents' motion for sanctions.

{¶ 41} I part ways with the majority, however, because it is wrong on the law. And because the majority is wrong on the law, it incorrectly concludes that some of Berry's claims for a writ of mandamus are moot and that Booth timely responded to Berry's public-records requests.

{¶ 42} R.C. 149.43(B)(1) requires a requester of a public record to transmit his or her request to "*a public office* or person responsible for public records." (Emphasis added.) Berry did just that. He sent his records requests to various TCI departments and employees that maintained the records he wanted.

{¶ 43} Because the majority misinterprets the law, it erroneously holds that Berry received all the records he requested and improperly concludes that Berry's request for a writ is moot as to some records that, in my view, Berry did not receive. Respondents blatantly disregarded Berry's public-records requests. And respondents lack credibility when they say the records were provided.

{¶ 44} Moreover, because of the errors by the majority, it wrongly determines that Booth timely complied with Berry's requests for public records and incorrectly denies statutory damages. Berry began making his requests in early August 2023, he filed his complaint in mid-September, and at the earliest, Booth provided the records in mid-October. That delay was plainly unreasonable.

{¶ 45} I would grant a writ of mandamus and order respondents to produce to both Berry and this court, within ten days of the court's decision, kite numbers 271473441, 271553901, 272785491, 272800391, and 272805871. I would also order respondents to produce the kites for the public-records requests for the local-policy index and the inmate-file directory. Respondents should also produce three documents: the master forms list, the Rule Infraction Board chairman's job description and qualifications, and TCI's sanction chart. I would also grant Berry statutory damages in the amount of $17,000—$1,000 for each public record that was not produced or was not timely produced. For these reasons, I concur in part and dissent in part.

**{¶ 46}** Because the majority misinterprets the plain text of the Public Records Act, I begin by examining who, under the law, must receive a public-records request to trigger the duty of the public office or the person responsible for the public records to respond.  R.C. 149.43(B)(1).

### I.  Who Must Receive a Public-Records Request
### to Trigger the Duty to Respond?

**{¶ 47}** Respondents contend that they had no duty to respond to any of Berry's requests "because Relator Berry did <u>not</u> deliver any of his 17 requests to the Public Information Officer," Booth.  (Underlining in original.)  That is, they contend that because TCI has designated Booth to handle all of TCI's public-records requests, Berry's requests to anyone other than Booth can be disregarded.

**{¶ 48}** That is a view that has been suggested by some members of this court.  *See*, *e.g.*, *State ex rel. Ware v. Dept. of Rehab. & Corr.*, 2024-Ohio-1015, ¶ 54 (DeWine, J., concurring in part and dissenting in part) ("I would deny the writ for the June 3, 2022 request because Ware did not submit that request to Booth, despite being fully aware that Booth is the person responsible for making TCI's public records available").  The problem with this position is that it is not supported by the Public Records Act.

**{¶ 49}** R.C. 149.43(B)(1) states that "upon request by any person, a public office *or* person responsible for public records shall make copies of the requested public record available to the requester."  (Emphasis added.)  The "use of the word 'or,' a disjunctive term, signifies the presence of alternatives."  *In re Estate of Centorbi*, 2011-Ohio-2267, ¶ 18; *see also* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 116 (2012).  The statute therefore speaks in terms of two entities that must respond to a public-records request: the public office itself or a person responsible for public records.

**{¶ 50}** The statute has several structural elements.  First, it says when copies must be made ("upon request") and who must make them—the public office or a

person responsible for public records. Second, the statute uses the word "a" in the phrase "a public office or person," not "the." The word "a" is an indefinite article meaning "any" and applying to more than one thing, *United States v. Alabama,* 778 F.3d 926, 933 (11th Cir. 2015); in contrast, the definite article "the" specifies the object and refers to a discrete thing, *Niz-Chavez v. Garland*, 593 U.S. 155, 165-166 (2021). The statute therefore applies to a public office (through its employees) and *any* person responsible for public records in the public office. So from the start, respondents' argument that only requests transmitted to TCI's public-information officer must be responded to is invalid.

{¶ 51} Taking all the statutory language together, when an employee of a public office or any person responsible for the public office's public records receives a public-records request, a joint duty arises for either the public office *or* a person responsible for public records to respond to it. And since one or the other must respond, the failure of one does not excuse the failure of the other. That means that if one of the people responsible for public records does not answer a public-records request received by the public office, the public office itself is still responsible to do it.

{¶ 52} A public office is free to designate a particular employee to be the person who responds to public-records requests. And the Ohio Department of Rehabilitation and Correction ("ODRC") requires "[e]ach managing officer [to] designate a public records coordinator to a) manage public records requests for the institution and b) be responsible for overseeing compliance with the requirements set forth in [ODRC's] policy and Ohio's public record law." ODRC Policy No. 07 -ORD-02(VI)(A)(1), https://drc.ohio.gov/about/resource/policies-and-procedures /07-ord-offender-records (accessed Nov. 26, 2024) [https://perma.cc/DQ42 -39YX]. But by title, a "public records coordinator" is not a "public-information officer." And use of the phrase "overseeing compliance" is not the equivalent to responding to requests, and the policy therefore contemplates that employees other

than the public-records coordinator will sometimes be called upon to respond to public-records requests.

{¶ 53} ODRC Policy No. 07-ORD-02(VI)(A)(2) also seems to contemplate this: "All ODRC personnel should familiarize themselves with the records considered 'public' and 'non-public' by ODRC," and they might be called upon to "[d]etermin[e] whether a record is a public record." [https://perma.cc/DQ42 -39YX]. And ODRC's public-records policy "applies to all Ohio Department of Rehabilitation and Correction (ODRC) employees and contractors, particularly those who receive and/or process requests for public records access and who review those materials prior to release." ODRC Policy No. 07-ORD-02(III) [https://perma.cc/DQ42-39YX].

{¶ 54} The public office may require its employees to send public-records requests they receive to the designated public-records coordinator for processing. And in fact, that might be the easiest way for a public office to ensure compliance with the law. But what the Public Records Act does not allow is the public office to ignore a public-records request simply because the request was sent to someone other than the person designated for processing public-records requests. In the end, the law mandates that once a public office has received a public-records request through any of its employees, either it or a person responsible for public records must respond. Both the text and the history of the Public Records Act compel this conclusion.

*A. History of the Public Records Act*

{¶ 55} When first enacted in 1963, the Public Records Act, R.C. 149.43, provided, "All public records shall be open at all reasonable times for inspection. Upon request, a person responsible for public records shall make copies available at cost, within a reasonable period of time." Am.Sub.H.B. No. 187, 130 Ohio Laws, Part I, 155, 1644.

{¶ 56} Notably, the words "public office or," which are contained in the current version of the Public Records Act, are missing from the first version of this statute. The first version referred to *a person*, and again, the word "a" is synonymous with "any." Construing the phrase "a person responsible for public records," this court recognized that a public-records requester who seeks to compel the production of public records is not required to bring suit "against the person *ultimately* responsible for the records, but [must bring] suit against *a person responsible for them*." (Emphasis in original.) *State ex rel. Cincinnati Post v. Schweikert*, 38 Ohio St.3d 170, 174 (1988).

{¶ 57} Over time, the General Assembly has broadened public access to government records. Before 1985, the Public Records Act defined a "public record" as any record that is "required to be kept" by any governmental unit. *See, e.g.*, former R.C. 149.43, 130 Ohio Laws, Part I, at 155. In 1985, the General Assembly changed the definition of "public record" by eliminating the words that limited the meaning of "public record" to a record "required to be kept" by the government, so that a "public record" is simply a record that is "kept" by the government. *See* former R.C. 149.43(A)(1), Am.Sub.H.B. No. 238, 141 Ohio Laws, Part II, 2761, 2774.

{¶ 58} The General Assembly continued this trend of broadening access when it passed Am.Sub.S.B. No. 78 in 1999, amending the Public Records Act to require "a *public office or* person responsible for public records" to provide copies of public records. (Emphasis added.) Former R.C. 149.43(B)(1), 148 Ohio Laws, Part IV, 8623, 8625. This amendment did not, however, include the definite article "the." Rather, the General Assembly expanded the scope of who may receive and who must respond to public-records requests.

{¶ 59} Under this language, the duty to produce copies of public records falls on the public office *as a whole* or *any* person responsible for public records. As this court acknowledged in *Cincinnati Post*, 38 Ohio St.3d at 174, the duty to

produce public records does not belong solely to the person in a position like Booth's, i.e., the person whom the public office designates as the person ultimately responsible for the public records.

{¶ 60} When the General Assembly amended the Public Records Act in 2006 to provide for an award of statutory damages, it made "the public office or person responsible for the requested public records" that failed to comply with R.C. 149.43(B) liable.  Former R.C. 149.43(C)(1), 2006 Sub.H.B. No. 9 (effective Sept. 29, 2007).   Again, the public office remained jointly responsible for providing public records, but to help "enforce the people's right to access public records," *State ex rel. Parker Bey v. Byrd*, 2020-Ohio-2766, ¶ 32 (Kennedy, J., concurring in judgment only in part and dissenting in part), the General Assembly added the threat of statutory damages for failure to comply.

{¶ 61} The concurring justice asserts that under my analysis, "a person can simply ask *any* public employee for a document and then recover statutory damages for violation of the Public Records Act if the document is not produced." (Emphasis added.)  Concurring opinion, ¶ 27.  That is not what I am saying.  First, it is not enough that a request is made to any public employee—it must be an employee of the public office or a person responsible for public records.  Second, a request does not automatically allow the requester to obtain a writ and statutory damages.  A public office can deny a request when the request is overbroad, when the public record does not exist, or when the record is exempt from production.  So the concurring justice reads my analysis too broadly.

{¶ 62} The concurrence maintains that "[t]he obvious problem with this [opinion's analysis] is that it renders superfluous the statutory language '*the* person responsible for *the* public records.'"  (Emphasis added.)  *Id.* at ¶ 30, quoting R.C. 149.43(C)(1).  It says that "[i]f the legislature had meant the term 'public office' to include every person in that office, there would have been no need to include 'the

person responsible for the public records' in the statute." *Id.*, quoting R.C. 149.43(C)(1).

{¶ 63} There is an immediate disconnect here. The concurrence is citing a different part of the Public Records Act than is at issue at this stage of the analysis. I am talking about R.C. 149.43(B)(1), which imposes the duty to receive and respond to records requests on "a public office or person responsible for public records." The word "the" is not in this phrase.

{¶ 64} The concurrence is quoting R.C. 149.43(C)(1), which allows issuance of a writ of mandamus and an award of statutory damages when "a public office or *the* person responsible for *the* public records" fails to comply with R.C. 149.43(B). Again, the General Assembly did not use the word "the" in 149.43(B)(1), even though subsection (C)(1)'s use of that word shows that the legislature knew how to. Further, the word "the" is used twice in R.C. 149.43(C)(1) for a reason. At the point that a writ of mandamus and statutory damages may be available, there has already been a request for a record that has been denied. Once *a person* responsible for public records fails to comply, that person—*the* person who failed to produce *the* record—may be sued in mandamus and may be liable for statutory damages. So the word "the" is used for a different reason in subsection (B)(1) than (C)(1). And "[t]he General Assembly's use of different words"—"a" vs. "the"—"signals a different meaning." *Obetz v. McClain*, 2021-Ohio-1706, ¶ 21.

{¶ 65} By focusing on the phrase "person responsible for public records," the concurrence reads the words "public office or" out of the statute. As noted above, R.C. 149.43(B)(1) requires two entities to produce public records: a public office or a person responsible for public records. The statute uses "or," so the public office and the person responsible for records must be different things—again, different words signal a different meaning, *Obetz* at ¶ 21. But a public office is an inanimate governmental body. A "public office" "includes any state agency, public

institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). In contrast, the statute defines "public official" to "include[] all officers, employees, or duly authorized representatives or agents of a public office." R.C. 149.011(D). As an inanimate governmental body, a public office relies on its public officials—its employees—to act for it.

{¶ 66} So who has to receive and answer a public-records request? The public office—through its employees—or a person responsible for public records. The statute therefore contemplates that someone other than a person responsible for public records may receive and have to respond to a public-records request. Other than a person responsible for public records, who can produce records on behalf of a public office? Public officials, the employees of the public office.

{¶ 67} Under the plain language of R.C. 149.43(B)(1), "a public office or person responsible for public records" must make copies of public records. So if the concurrence is correct, the statute should read like this: "upon request by any person **to a person designated by a public office to be the person responsible for fulfilling public records requests**, a public office or **the** person responsible for public records shall make copies of the requested public record available to the requester at cost and within a reasonable period of time." The problem for the concurrence, however, is that that is not what R.C. 149.43(B)(1) actually says.

{¶ 68} The concurrence presents an example involving a person who makes a public records request for the secretary of state's travel records to an election worker employed for a single day. The first question that arises is whether election workers are employed by the secretary of state rather than by a local board of elections. But even taking it at face value, that hypothetical is nowhere near what happened here. Berry submitted record requests to specific departments and employees who had a duty to maintain the records Berry requested. He sent his requests to a public office and to a person responsible for those public records. That

22

is a valid public-records request under the Public Records Act. Whether mandamus would lie in the circumstances presented by the concurrence's hypothetical is not something that can be decided based on the evidence presented in this case.

{¶ 69} And consider the necessary consequences of the concurrence's reasoning. For example, this court is a public office that maintains public records. The court—comprising seven justices—is ultimately responsible for its public records. What happens when a person appears at the counter of our clerk's office and requests a copy of a pleading filed in this case? The deputy clerk who takes that request is not the person ultimately responsible for our public records, even though she keeps them in order and has immediate access to them. Nonetheless, the request has been submitted to a public office—this court and the clerk's office— and to one of the people responsible for maintaining records. Under the concurrence's reasoning, our deputy clerk could simply say no. But it is hard to dispute that this court would have to respond to the request. In fact, our Administrative Policy 36(A)(2) requires *any employee* of this court who receives a request for court records to send that request to our clerk of court.

{¶ 70} Our deputy clerk is not different from the people that Berry submitted public-records requests to at TCI. When he requested laundry records from the laundry department, he made a request to a public office for records that are kept by the laundry and maintained by employees working in the laundry. A laundry employee should have responded to the request or forwarded it to Booth. That the laundry employee did not do that does not mean that TCI (the public office who employed the laundry worker) is absolved from responding to the request.

*B. Applying the Law to Berry's Requests for Public Records*

{¶ 71} As the foregoing discussion shows, R.C. 149.43(B)(1) imposes the duty to make copies of public records on *any* person responsible for the public office's public records. Therefore, respondents are grievously wrong when they

claim that only those public-records requests received by the public office's designee to process public records must be answered.

{¶ 72} Here, TCI—a public office—received 17 public-records requests through its employees, including Booth, "T. Ventura," "D. Porter," "S. Douglas," "F. Lowery," "F. Cimmento," "S. Stevens," "M. Armstrong," "J. Pierce," "D. Coe," "Lt. Scott," and "D. Filkron." Those employees should have answered the requests to provide records under their control or sent the requests to Booth, because under R.C. 149.43, TCI's employees had a duty to respond to the records requests unless another person responsible for the records answered first. This is true regardless of whether Booth received or even knew about the requests.

{¶ 73} With this understanding of the law, I turn to Berry's complaint for a writ of mandamus.

### II. Berry's Complaint for a Writ of Mandamus Is Not Moot

{¶ 74} The majority is incorrect when it says that Berry's request for a writ of mandamus is moot regarding some records—the evidence shows that Booth did not provide him with all the public records he requested. To explain why, it is helpful to flesh out the facts of this case, some of which the majority ignores. The best place to start is explaining what the form and content of a kite is, which will show how Berry made his public-records requests to TCI.

### A. Form and Content of a Kite

{¶ 75} As I have previously explained,

"[a] 'kite' is written by an inmate to a member of the prison staff and is 'a means for inmates to contact staff members inside [an] institution.'" *State ex rel. Martin v. Greene*, 156 Ohio St.3d 482, 2019-Ohio-1827, 129 N.E.3d 419, ¶ 3, fn. 1, quoting *State v. Elmore*, 5th Dist. Richland No. 16CA52, 2017-Ohio-1472, ¶ 15. Pursuant to a DRC policy, "[t]he inmate kite system shall be utilized

24

as the means of two-way communication between all levels of staff and inmates." DRC Policy 50-PAM-02, at 6, https://drc.ohio.gov/Portals/0/Policies/DRC%20Policies/50-PAM-02% 20(12-2019).pdf?ver=2019-12-09-140951-550 (accessed June 15, 2020) [https://perma.cc/R42H-UHK2]. The DRC's protocol for responding to kites is to answer each kite "within seven (7) calendar days." *Id.* Kites must also receive an entry in the prison's kite log. *Id.* And responses must be "either written directly on the kite received or on the Kite Response form." *Id.*

(First set of brackets added.) *State ex rel. McDougald v. Greene*, 2020-Ohio-3686, ¶ 40 (Kennedy J., dissenting).

{¶ 76} As a visual example, Berry's kite number 270075511, which he sent to Booth on August 4, 2023, and which he submitted in this case as exhibit A, is reproduced below.



Request #270075511                                                     $Ex. \overline{A}$

**Profile Photo:**

**Inmate Info**

Name: DONNY BERRY (1984-04-14)
Booking #: A656824
Nationality:
Submitted Date: 08-04-23 15:41
Submitted from Location/Room: TCI.A.13E.226B.0000-13-EAST
Submitted Facility: ODRC Trumbull CI
Current Location/Room: TCI.A.13E.226B.0000/13-EAST
Current Facility: ODRC Trumbull CI
MAC ID: 10:2C:6B:3D:0A:9E
Device ID: 102C6B3D0A9E

Audit Photo

**Form Info**

Category: Warden's Office
Form: Kite - Warden

**Request Info**

Status: CLOSED by Booth, G.
Facility Deadline: 08/11/23 23:59

**Details of Request:**

Request for warden assistant

**Details of Request:**

**Please state the nature of your kite. Be specific.:**
I am putting a proposal together for a purchase order from the Industrial and Entertainment fund as I would like to request a copy of the current bank statement from the bank the institution uses to manage the account. I am assuming the statement will show the deposits and withdrawals for the last 30 days as well as the current balance.

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 08-27-23 19:28 | DONNY BERRY | Viewed Staff Response | |
| 08-19-23 20:06 | DONNY BERRY | Viewed Staff Response | |
| 08-10-23 20:01 | DONNY BERRY | Viewed Staff Response | |
| 08-08-23 14:50 | DONNY BERRY | Viewed Staff Response | |
| 08-07-23 13:45 | Booth, G. | Staff Response | This is a staff function. This should be handled by your group advisor. If they have any questions on that they can check with the business office. |
| 08-07-23 13:45 | Booth, G. | Changed Status | From 'Open' to 'Closed' |
| 08-04-23 15:41 | DONNY BERRY | Submitted New | Request for warden assistant |

{¶ 77} A review of this sample kite shows all the information that is transmitted to the office or institution employee when it is sent. The kite gives identification information about the incarcerated person. It shows that a kite receives a timestamp when the incarcerated person transmits the kite as well as

when any subsequent message related to the kite is relayed between the incarcerated person and an employee of the institution.

{¶ 78} It has a "Form Info" section that includes a "Category" field, which identifies the office in the institution that received the kite from the incarcerated person, as well as a "Form" field, which provides more specific information about the employee of the institution who received the kite. For the kite reproduced above, the "Category" section indicates that it was submitted to the warden's office and the "Form" field shows it was submitted to the warden. A kite also has two sections labeled "Details of Request." Underneath the second "Details of Request" section, there is a subheading: "Please state the purpose of your kite. Be specific." (Emphasis omitted.)

{¶ 79} The last section of the kite has columns for "Date/Time," "User"— which refers to who is communicating—i.e., the incarcerated person or the employee of the institution—"Action," and "Details." "Action" refers to what happened to the kite, such as its being viewed by the incarcerated person or its status being changed by an employee of the institution. The "Details" section often includes the employee's response to the incarcerated person's communication and provides more details about the kite logged by the system, such as when the status is changed from open to closed.

{¶ 80} With this understanding of the information contained in a kite, I turn to Berry's public-records requests.

## B. Berry's Public-Records Requests

{¶ 81} In August 2023, Berry transmitted 17 public-records requests via kite to various TCI offices and employees. A discussion of each kite will aid the reader of this opinion in understanding how Berry's claim should be analyzed. Importantly, all the requests were requests for documents or other records, and in response to each request, the institution employees responded either by giving

Berry information rather than the record he requested or by denying the requests altogether.

### 1. *Public-Records Requests for which Berry Has Submitted Kites into Evidence*

{¶ 82} As evidence in this case, Berry submitted eight of the kites he sent to TCI requesting public records. He received copies of the kites from Booth through another public-records request. The dates of the kites are relevant to determining whether Booth responded to the requests in a reasonable time.

{¶ 83} On August 4, Berry requested from the warden's office the current bank statement for TCI's industrial-and-entertainment-fund account. Berry indicated that this was a "Request for warden assistant," i.e., Booth, and he wrote, "I would like to request a copy of the current bank statement from the bank the institution uses to manage the [industrial-and-entertainment-fund] account." Although this was clearly a request for a document—i.e., a statement—Booth closed the kite on August 7, stating, "This is a staff function. This should be handled by your group advisor. If they have any questions on that they can check with the business office." Booth therefore denied the request.

{¶ 84} Berry transmitted the following six public-records requests on August 9 (in addition to others sent that same day discussed in the next section).

{¶ 85} First, Berry requested the music-room practice schedule from "Recreation," i.e., the recreation department. Berry wrote, "I would like to request a copy of the music room practice schedule to see when my band is scheduled to practice." Berry plainly requested a document—the schedule. Instead of providing that document, "T. Ventura" resolved the kite on August 16, stating "Have you gone through Music Therapy? If you have I will need a copy of your certificate and then you can be added to the schedule. If you haven't you will need to go through Music Therapy. Who did you speak to about being on the band room [schedule]?" So this request was denied.

28

{¶ 86} Second, Berry requested TCI's list of approved vendors from "Mail," i.e., the mail department. Berry wrote, "I would like to request a copy of the institution's list of Approved vendors which shows which outside vendors inmates are allowed to order items from which will be accepted by the institution mail room." "D. Porter" closed the kite on August 10, responding, "Union Supply, Access Securpak, and Walkenhorst's. You can get the catalogue from your Sergeant." Importantly, D. Porter did not say that no such record exists, and he denied the request for a document—the list of approved vendors.

{¶ 87} Third, Berry requested a copy of the unit laundry schedule from "Laundry," i.e., the laundry department. Berry wrote, "I was told that the laundry was responsible for creating the schedule for sheets and blankets to be picked up and washed from the units. I would like to request a copy of the schedule from the individual that creates the schedules." Berry plainly requested a document—a schedule. "S. Douglas" closed the kite on August 10 and denied the request, saying "no."

{¶ 88} Fourth, Berry requested the "electronic forms catalog" from the warden's office and wrote, "Document request for Warden Assistant," i.e., Booth. Berry wrote, "I would like to request a copy of the electronic forms catalog on a disc." Booth closed the kite on August 10, stating, "You are not authorized to have a disc." That was a denial of the request.

{¶ 89} Fifth, Berry requested a copy of the grievance procedure and "a paper grievance form" from "Administration" and directed it to Inspector of Institutional Services. Berry wrote, "Request for Document" and "I would like to request a copy of the grievance procedure from you . . . . I would also like to request a paper grievance form from you." "F. Lowery" closed the kite on August 10. Instead of providing Berry with the documents he requested, Lowery explained how Berry could submit a grievance electronically, effectively denying the request.

{¶ 90} Sixth, Berry requested the unit commissary shopping schedule from "Commissary." Berry wrote, "Request for documents from commissary supervisor in charge of scheduling unit shopping days" and "I would like to request a copy of the unit commissary shopping schedule which shows the days of the week that each unit shops for the next month of August 2023." "F. Cimmento" closed the kite on August 11, responding, "It is the 8:15 am rec schedule." Cimmento therefore failed to fulfill the request.

{¶ 91} On August 12, Berry requested a copy of the chapel activities for August 2023 from "Religious Services." Berry wrote, "Request for documents" and "I would like to request a copy of the chapel August activities calendar." "M. Armstrong" closed the kite on August 16, stating, "It is posted in your [unintelligible]." That was a denial, since Berry requested his own copy.

### 2. Public-Records Requests for which Berry Has Not Submitted Kites into Evidence

{¶ 92} The concurring justice states that this opinion "treats unsworn statements by Berry as evidence," concurring opinion at ¶ 37, but that is simply not true. Booth avers that Berry sought 17 public-records requests via electronic kites and lists all of Berry's kites. Included in Booth's list are Berry's public-records requests and the documents Booth produced in response to those requests.

{¶ 93} Four of the kites were submitted to TCI on August 9.

{¶ 94} First, Berry requested the "safe cell inspection form" from the mental-health department. Berry avers that "D. Coe" denied the request on August 12. According to Booth, this was one of the documents he produced to Berry.

{¶ 95} Second, Berry requested "the open office hours schedule" from the mental-health department. This request was denied by "D. Coe" on August 15. This was another document Booth produced to Berry.

{¶ 96} Third, Berry requested a copy of "the local policy index." Booth denied the request. Booth then produced the document to Berry.

{¶ 97} Fourth, Berry requested "the inmate file directory." Berry avers in his complaint that Booth did not provide him with this record. Booth averred that no responsive record was available.

{¶ 98} Berry made three public-records requests on August 14. First, he requested the "body camera footage of Officer Green" for a specific date. In his "Explanation of Evidence" that is attached to the evidence he submitted in this case, Berry asserts that "Warden Office faculty staff" denied the request on August 17. Booth avers that there was no responsive record.

{¶ 99} Second, Berry requested the "ODRC master forms list" from TCI's librarian. In his verified complaint, Berry states that "librarian D. Filkron" denied his request on August 16. Booth avers that Berry inspected the master forms list and that he provided Berry with a copy of the master forms list from the library. In response Berry wrote, "Not what looking for."

{¶ 100} Third, Berry requested "the form used to log the weekly Rule Infractions Board ("RIB") Rulings, Rule Infraction Board Chairman Job Description and Qualifications and [TCI] Sanction Chart." Berry states, "Lt. Scott" denied the public-records request on August 22. Booth avers that he provided Berry with a copy of the form used to log weekly RIB rulings (sanction grid) and that Berry inspected the sanction grid form. In response someone wrote, "Not the sanction grid (not what attached.)." On August 15, Berry requested a copy of "the Institutional Food Menu from the Food Service Department." According to Berry's verified complaint and his Explanation of Evidence, "J. Pierce" denied the request on August 15. Booth does not dispute this assertion. (Berry submitted into evidence a copy of a kite he sent on August 17 requesting "a copy of the inmate chowhall menu" from the "Unit Manager." Berry notes in the request that he had previously requested the menu from "the chowhall" and had been told to request the menu from the Unit Manager. Berry does not assert that there was a violation of the Public Records Act related to this August 17 request.)

{¶ 101} Lastly, Berry says in his verified complaint that on August 23, he requested from Booth all the kites that Berry sent from August 4 through August 27. Booth does not raise any issue with Berry's apparently requesting copies of kites that he would send in the future. Booth also does not dispute that Berry made this request—Booth's affidavit says that Berry requested "specific kites between 8/4/23 – 8/27/23."

{¶ 102} So, in total, there are 17 public-records requests at issue in this case. And with regard to each of those 17 requests, institution employees failed to fulfill them, leaving Berry with only one option—filing a complaint for a writ of mandamus.

### C. Berry's Complaint for a Writ of Mandamus

{¶ 103} Berry filed this mandamus action on September 13, 2023. Once Berry filed his complaint, he was entitled to $100 for each business day that Booth and TCI failed to comply with R.C. 149.43(B)'s requirement to promptly respond to public records requests, up to ten days, R.C. 149.43(C)(2). The tenth business day after Berry filed the complaint was September 27, 2023; if TCI failed to comply with R.C. 149.43(B) by then, Berry is entitled to $1,000 for each unfulfilled request.

### D. Booth's Actions Following the Filing of the Complaint

{¶ 104} On October 2, 2023, Booth met with Berry to discuss Berry's public-records requests. Booth says he then reviewed the Supreme Court's docket in this case on October 9 and reviewed the complaint—a copy of which had already been served on him.

{¶ 105} On October 13—30 days after Berry filed the complaint—Booth provided Berry with the bank statement, the music-room practice schedule, the approved-vendors list, the unit laundry schedule, the grievance procedure, the commissary schedule, the safe-cell-inspection form, the mental-health open-office-hours schedule, the food-service menu/schedule, the chapel activities calendar, "the form used to log weekly [Rule Infraction Board] rulings (sanction grid)," the local-

policy index, and "specific" kites. Booth said there were no responsive records for the electronic-forms catalog, the body-camera footage, and the inmate file directory.

{¶ 106} That same day, Booth had Berry sign a document ("the October 13 list") stating that he had received the records listed above and acknowledging that there were no responsive records for three of his requests. However, Booth had not fulfilled two of the records requests—a notation on the list signed by Berry says that Booth had not provided the right documents in response to Berry's requests for the master forms list and for the Rule Infraction Board documents. And Booth's list of documents produced says only that "specific kites" were produced—it does not say which ones.

{¶ 107} After this court granted an alternative writ, Booth filed an affidavit in which he avers that he provided Berry all the documents responsive to his requests on the October 13 list, and he notes on the list that Berry "inspected" the master forms list and the "form used to log weekly [Rule Infraction Board] rulings (sanction grid)." (Again, Berry had requested copies of the documents.) The affidavit does not specify which kites he gave to Berry; it says that Berry received "specific kites between 8/4/23 – 8/27/23." Booth did not submit copies of the records that he produced to Berry with the evidence he filed in this court.

{¶ 108} In his Explanation of Evidence, Berry does not address the fact that he had signed a document acknowledging receiving some of the records he requested. He does, however, submit an affidavit averring that Booth did not provide him with 7 of the 16 kites that he requested, specifically, the kites requesting the local-policy index (kite number unknown), the safe-cell-inspection form (kite number 271473441), the master forms list (kite number 272785491), the body-camera footage (kite number 272800391), the mental-health office-hours schedule (kite number 271553901), the inmate-file directory (kite number unknown), and the Rule Infraction Board documents (kite number 272805871).

Berry also submits 32 pages of documents that he says were the documents that Booth provided him. The kites for those seven records are not included within those 32 pages.

*E. Review of the Evidence*

{¶ 109} As the above statement of facts shows, there is conflicting evidence regarding whether Booth provided Berry with the seven remaining kites. Booth says he gave Berry all kites requested, and Berry says he did not. Also, it is clear from the above that Berry has not yet been provided copies of the master forms list, the Rule Infraction Board chairman's job description and qualifications, and TCI's sanction chart.

{¶ 110} In this case, as in all original actions, each justice sits as the trier of fact. *See State ex rel. Lindenschmidt v. Butler Cty. Bd. of Commrs.*, 1995-Ohio-49, ¶ 11. And as the trier of fact, each justice may believe or disbelieve, in whole or in part, the testimony presented to this court. *See Gillen-Crow Pharmacies, Inc. v. Mandzak*, 5 Ohio St.2d 201, 205 (1966).

{¶ 111} And for the following reasons I credit Berry's evidence over Booth's.

{¶ 112} First, the evidence shows that notwithstanding his sworn statement, Booth did not provide Berry with all the kites that he requested. In his Explanation of Evidence, Berry included 32 pages of documents: 24 pages of prison records along with eight kites requesting public records.

{¶ 113} In their brief, respondents do not argue that Booth produced any more documents than those included in Berry's evidence. Booth charged Berry $1.55 for the records he produced, at five cents a page. Booth admits that there were 17 public-records requests transmitted through kites—16 for copies of TCI records other than kites and one for copies of the associated 16 kites requesting each record. That means that Berry requested a total of 32 documents—16 records other than kites plus 16 kites. Even if each record was only one page long, it would

have cost Berry a minimum of $1.60. However, not all the records were only one page long.

{¶ 114} For example, Booth avers that he provided Berry with the "institution's grievance procedure," and that document ("[t]he inmate grievance procedure") is included in Berry's evidence. The grievance-procedure document is five pages long. What is clearly the prison's menu is an additional three pages. And the bank statement, the approved-vendors lists, and the chapel activities calendar for August are each two pages. Therefore, the cost of all 32 records would far exceed $1.55 if Booth really had provided all of them to Berry. Booth's claim that he provided all the records that Berry requested is therefore not credible.

{¶ 115} Other things cut against Booth's credibility when he says that there are no unfulfilled requests.

{¶ 116} Booth states in paragraph five of his affidavit that he was "not aware of [Berry's] requests because [Berry] did not deliver them to [him]." But this court knows that this is not a truthful statement based on the evidence.

{¶ 117} First, Booth contradicts that testimony in paragraph seven of his affidavit, in which he avers, "Berry was provided all responsive documents for his many requests for information that *he had sent to me via his electronic prison kites in August 2023*." (Emphasis added.)

{¶ 118} Second, Berry also submitted into evidence copies of kites that were sent directly to Booth. Berry requested the bank statement for the "Industrial and Entertainment fund" from the warden's office and directed the request to the warden's assistant, i.e., Booth. Booth responded to this request by denying it on August 7, 2023. More than two months later, and only *after* Berry filed the complaint for a writ of mandamus in this case, Booth fulfilled the public-records request by giving Berry a copy of the statement from Huntington Bank. Booth therefore cannot legitimately deny the fact that he was aware of Berry's request for the bank statement or that the request was sent to him.

{¶ 119} The public-records request that Berry made for the "electronic forms catalog on a disc" likewise was transmitted to the warden's office and directed to Booth. Booth initially denied that request, saying that Berry was not allowed to have a disc. He subsequently responded to this request two months later by saying that there were no responsive records. But again, this shows that Booth received this request.

{¶ 120} In another example of his lack of candor, Booth avers in paragraph seven of his affidavit that Berry's requests were only "requests for information." Respondents' attorneys reiterate this assertion throughout the argument in respondents' brief. If it is untrue that Berry made only requests for information, it would be a material misrepresentation. This is because a request for information is not a public-records request, and the Public Records Act imposes no duty on a public official to fulfill it. *State ex rel. Griffin v. Sehlmeyer*, 2022-Ohio-2189, ¶ 10-12.

{¶ 121} It is blatantly untrue to call Berry's requests for public records "requests for information." Most obviously, Booth in his affidavit and counsel in respondents' brief admit that Berry requested copies of kites, and this court has recognized that *kites are public records*. *State ex rel. Mobley v. Ohio Dept. of Rehab. & Corr.*, 2022-Ohio-1765, ¶ 26. A request for copies of kites is patently not a "request for information."

{¶ 122} Booth avers that Berry "never identified any of his 17 requests for information as a public records request." The majority correctly recognizes that a requester of public records is not required to use magic words or talismanic language to request a public record. As TCI's "Public Information Officer," Booth should be aware of this; ODRC Policy No. 07-ORD-02(VI)(C)(1) says, "Ohio's public record law does not require specific language to make a public records request," [https://perma.cc/DQ42-39YX].

{¶ 123} Booth also admits that Berry asked for copies of a statement, schedules, a catalog, the grievance procedure, forms, menus, lists, a calendar, an index, and a directory. And in the argument section of respondents' brief, counsel connects these requests to specific kites that Berry sent to TCI employees. Booth also avers that in October 2023, he provided Berry with "documents or records" in response to Berry's August requests, showing that even Booth understands that Berry was requesting records.

{¶ 124} The fact that Berry was requesting records is borne out by the kites that Berry submitted into evidence. Kite number 270075511 "request[ed] a copy of the current bank statement"; kite number 271551581 "request[ed] a copy of the electronic forms catalog on a disc"; kite number 271555651 "request[ed] a copy of the music room practice schedule"; kite number 271476271 "request[ed] a copy of the institution's list of Approved vendors"; kite number 271420491 "request[ed] a copy of the [laundry] schedule from the individual that creates the schedules"; kite number 271553181 "request[ed] a copy of the grievance procedure" and "a paper grievance form"; kite number 271466711 "request[ed] a copy of the unit commissary shopping schedule"; kite number 273696311 "request[ed] a copy of the inmate chowhall menu"; and kite number 272199411 "request[ed] a copy of the chapel August activities calendar."

{¶ 125} Consequently, no one could reasonably believe that Berry had submitted only requests for information.

{¶ 126} An affidavit is a form of written testimony. *See Wallick Properties Midwest, L.L.C. v. Jama*, 2021-Ohio-2830, ¶ 18 (10th Dist.). But the concurrence suggests that we can weigh the credibility of evidence only if it is provided through live testimony subject to cross-examination. As far as I know, and at least for the 12 years I have been on this court, the justices of this court have *never* presided over an evidentiary hearing. Even in a case with as much importance as our last redistricting cases, we did not take live testimony. If the concurrence is correct,

since we *never* have evidentiary hearings in the courtroom and *never* take live testimony, then we can *never* make any credibility determinations and *always* have to take anyone's affidavit—or any evidence presented—at face value. We do not leave common sense at the courtroom door. So when a party's affidavit is self-contradictory on basic facts—such as whether he did or did not receive a public-records request (which is a core question in this case that Booth should get right)—I feel no compulsion to believe that party just because he did not say it to my face.

{¶ 127} The concurrence's second footnote does not seem to be fully thought out. I admit that I did not find a case from this court saying that we are the fact-finders who weigh the evidence in an original action. Some ideas are so obvious that they never get expressed in an opinion. For this reason, I have had to argue from an analogy to other fact-finders. But the concurrence's insistence that this court may not weigh the credibility of competing affidavits is wrong as it applies to original actions. How would we decide any original action without weighing evidence? *Today*, the majority opinion—which the concurring justice joins—denies Berry relief after weighing the evidence presented in competing affidavits and deciding that he failed to meet the burden of proof by clear and convincing evidence.

{¶ 128} Even the concurrence's citation to *State ex rel. Howson v. Edmonson*, 2024-Ohio-4619, is misguided—plainly if we are saying the evidence is equally *balanced*, that's *weighing* the evidence by stacking up one side's evidence against another's. By the concurrence's reasoning, this court would be paralyzed almost any time an original action is presented in this court because we could never decide who to believe. That is not how it works. We review the evidence. We weigh it. And we are persuaded, one way or another.

{¶ 129} A recent example shows that this is true. In *State ex rel. Ware v. Vigluicci*, 2024-Ohio-3131, we weighed competing affidavits to determine whether the relator had in fact made a public-records request to a prosecutor. One affidavit

asserted that the alleged public-records request had writing on two sides of the paper, and the other affidavit said that the documents had writing on only one side. We did not say that the evidence was evenly balanced. Rather, we ordered the prosecutor to file the original documents, and the prosecutor authenticated those documents by affidavit. Without the benefit of live testimony or an evidentiary hearing, we decided that the prosecutor had proved that the relator had committed a fraud on the court, and we declared the relator a vexatious litigator. *See State ex rel. Ware v. Vigluicci*, 2024-Ohio-4997.

{¶ 130} In any case, the concurring justice has the prerogative to believe who he wants to believe. If he wants to credit an affidavit with obvious misstatements, he should go for it. That is my point. Each of us weighs the evidence. For all these reasons, I would find not credible respondents' evidence and would conclude that Berry has proved that respondents have failed to produce the seven missing kites in response to Berry's public-records request seeking copies of his kites.

{¶ 131} In addition, I would find that respondents have failed to produce the master forms list. While Berry admitted that he had received many of the public records he requested, the October 13 list that Berry signed showed that the master forms list was not provided to Berry on October 13. Berry asserts that he never received it, and it is not among the records that Berry submitted into evidence. Further, Berry also requested the Rule Infraction Board chairman's job description and qualifications and TCI's sanction chart. The job description and qualifications are not mentioned in the October 13 list of fulfilled requests that Berry signed, nor has Berry included it in his evidence. Also, the October 13 list indicates that Booth produced the wrong document in response to the request for the sanction chart, and it is also not included in Berry's evidence.

{¶ 132} The evidence demonstrates that respondents have not provided all the requested records. Therefore, I would grant a writ of mandamus and order

respondents to produce these ten records: the seven missing kites, the master forms list, the Rule Infraction Board chairman's job description and qualifications, and TCI's sanction chart.

*F. Respondents' Frivolous Arguments*

{¶ 133} Respondents, through counsel, presented numerous defenses in their answer and brief that no one could believe were tenable. For example, in their answer, respondents claim that the records Berry requested are exempt from disclosure as medical records; confidential law-enforcement investigatory records; records that the law prohibits release of; records that disclose the identity of an uncharged suspect or a witness or that provide information provided by a confidential informant; and records requested by an incarcerated person concerning a criminal record or prosecution. None of the records that Berry requested are even remotely exempt from release on any of these grounds.

{¶ 134} In another example, the answer claims that the complaint is barred because Berry "failed to comply with the mandatory requirements of R.C. § 2969.25" by failing to file an affidavit disclosing his previous civil actions. However, R.C. 2969.25 does not apply to original actions filed in this court. R.C. 2969.21(B)(2); *State ex rel. McDougald v. Greene*, 2018-Ohio-4200, ¶ 8. But even if it did, *Berry filed an affidavit disclosing his previous civil actions*.

{¶ 135} The concurring justice noted in a prior case "the multitude of motions containing misstatements of law that this court has received from the state in recent prisoner public-records cases," and he has pointed out that "neither the public nor this court is served by advocacy that regularly misstates the law." *State ex rel. Mobley v. Chambers-Smith*, 2024-Ohio-1910, ¶ 15. ORDC would be well advised not to continue this practice.

### III. Statutory Damages

{¶ 136} R.C. 149.43(C)(2) provides:

If a requester transmits a written request by hand delivery, electronic submission, or certified mail to inspect or receive copies of any public record in a manner that fairly describes the public record or class of public records to the public office or person responsible for the requested public records, except as otherwise provided in this section, the requester shall be entitled to recover the amount of statutory damages set forth in this division if a court determines that the public office or the person responsible for public records failed to comply with an obligation in accordance with division (B) of this section.

{¶ 137} Again, as the above analysis shows, respondents failed to timely respond to Berry's public-records requests as required by R.C. 149.43(B)(1), and a kite is a form of electronic submission, *State ex rel. Suggs v. McConahay*, 2022-Ohio-2147, ¶ 12. Therefore, Berry is entitled to statutory damages.

{¶ 138} Under R.C. 149.43(C)(2), a person who seeks to compel compliance with the Public Records Act through a mandamus action may recover $100 for each business day during which the public office failed to comply with R.C. 149.43(B), beginning on the date of commencement of the action, and the person may be awarded a maximum of $1,000 for each public-records request.

{¶ 139} Berry filed his mandamus action on September 13. It was not until October 13 that Booth responded to Berry's requests for the bank statement, the music-room practice schedule, the approved-vendors list, the unit laundry schedule, the grievance procedure, the commissary schedule, the safe-cell-inspection form, the mental-health open-office-hours schedule, the food-service menu/schedule, the master forms list, the chapel activities calendar, "the form used to log weekly [Rule Infraction Board] rulings (sanction grid)," and the local-policy index. And even at this point, respondents have not fulfilled Berry's requests for copies of the master

forms list, the Rule Infraction Board chairman's job description and qualifications, TCI's sanction chart, and seven kites.

{¶ 140} Even if I took Booth's affidavit and respondents' brief at face value, which I do not, Booth did not respond to Berry's public-records requests until a month after Berry filed his complaint. It therefore cannot be disputed that more than ten business days elapsed between the filing of the complaint and respondents' compliance with R.C. 149.43(B).

{¶ 141} The majority, however, says that Booth's delay of over a month in responding to Berry's requests was reasonable: "[Berry] allegedly transmitted 17 requests for records in August 2023, and all responsive documents were produced by October 13, 2023. Given the number of requests, this response period is not unreasonable." Majority opinion at ¶ 20. I cannot understand how the majority says that Berry *allegedly* submitted the requests when even Booth's affidavit admits he did.

{¶ 142} In any case, each of the records requested was readily available for production, and many of the requests were *transmitted directly to Booth*. And in this case, we know that it took Booth only *eight business days* to respond to the requests after he met with Berry about them. The delay of approximately two months is plainly not reasonable.

{¶ 143} Therefore, it is clear that respondents failed to comply with the Public Records Act in relation to the 17 separate requests and that they did not comply until more than ten days after the filing of the complaint. Therefore, Berry is entitled to $17,000 in statutory damages.

### IV. Additional Flaws in the Majority's Analysis

{¶ 144} As noted above, the majority incorrectly concludes that most of Berry's public-records requests were responded to within a reasonable time. However, for three public-records requests, the majority takes a different tack. With regard to Berry's request for the Rule Infraction Board chairman's job

description and qualifications and TCI's sanction chart, the majority says that the request was not valid because there is "no allegation or evidence that [Berry] transmitted this request either to Booth (i.e., the person at TCI 'responsible for public records,' R.C. 149.43(B)(1)) or to a 'public office.'" Majority opinion at ¶ 15. It similarly says that respondents' denials of Berry's requests for the commissary schedule and the chapel activities calendar were not a problem, because "[t]here is no evidence that [Berry] transmitted these requests to Booth, the person responsible for public records at TCI, R.C. 149.43(C)(1), or to a 'public office.'" Majority opinion at ¶ 19. The majority is wrong.

{¶ 145} First, Berry has established that Booth failed to produce the kite requesting the Rule Infraction Board chairman's job description and qualifications and TCI's sanction chart. Booth therefore deprived Berry of the ability to prove that he submitted this request to a public office or person responsible for those records. I would draw the inference that the contents of the withheld kite would show that Berry made a valid public-records request to TCI. "When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." *Nation-Wide Check Corp., Inc. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217 (1st Cir. 1982). (The same negative inference would also apply to the other requests for which Booth failed to produce the kites.)

{¶ 146} And second, the kites requesting the commissary schedule and the chapel activities calendar are in the record. They state clearly to whom the requests were made. The kite requesting the commissary schedule was directed to "Commissary" and the "commissary supervisor in charge of scheduling unit shopping days." The kite requesting the chapel activities calendar was directed to "Religious Services," and respondents admit in their brief that a prison chaplain denied the request. It does not take much imagination to believe that the

commissary and its supervisor maintained the commissary schedule and that Religious Services and the prison chaplain maintained the chapel activities calendar. It is baffling that the majority concludes that these requests were not transmitted to a public office or a person responsible for public records. Berry's kites in evidence show that he directed his kites to the appropriate departments. In addition to the kites Berry sent to Booth, he requested the music-room practice schedule from "Recreation," the approved-vendors list from "Mail," the laundry schedule from "Laundry," and the grievance procedure from the "Inspector" in "Administration." There is no reason to doubt that Berry did this with his other kites.

{¶ 147} The majority's analysis is therefore not only unpersuasive but is also wrong on the law and the facts.

### V. Conclusion

{¶ 148} In my view, it is apparent that this court and employees at TCI are openly dismissive of public-records requests made by incarcerated people. Perhaps they believe that incarcerated people are less deserving of the right to access public records. Maybe members of this court think that incarcerated people are lesser citizens than people who are not incarcerated. But regardless of what this court thinks, the General Assembly, as a matter of fair and equitable public policy, has acted to preserve the right of access to *all citizens* of this state.

{¶ 149} If any restrictions are to be imposed on that statutory right of access, it is the General Assembly that must do it, not this court. Instead of ignoring the plain, unambiguous text of the Public Records Act and rewriting the law to thwart requests for public records by incarcerated people, the court may, if it wishes, call on the General Assembly to make changes in the law that reflect the court's own notions of good public policy.

{¶ 150} Notably, the State has options if it wishes to avoid awards of statutory damages to incarcerated people in public-records cases.

{¶ 151} For example, as noted above, ODRC's public-records policy requires each prison's managing officer to "designate a public records coordinator" to manage public-records requests and be responsible for overseeing compliance with R.C. 149.43. ODRC Policy No. 07-ORD-02(VI)(A)(1), [https://perma.cc/DQ42-39YX]. The General Assembly could build upon this policy to require all public-records requests by incarcerated people to be submitted to the public-records coordinator of the prison.

{¶ 152} There are things that ODRC itself can do to avoid statutory-damages awards. It already has a policy requiring that "[a]ll ODRC personnel . . . familiarize themselves with the records considered 'public.'" ODRC Policy No. 07-ORD-02(VI)(A)(2). It could provide additional training to ODRC staff to help ensure that all public-records requests received by any employee are forwarded to the public-records coordinator. In addition, it could amend the kite system to require incarcerated people to check a box to indicate when a kite is a request for a public record. Then the kite could automatically be routed to the public-records coordinator. (That might not have helped in this case, since Booth, the public-records officer, failed to properly respond to the requests Berry sent to him.)

{¶ 153} Therefore, there are many things that the State can do to prevent the increasing number of writ actions filed in this court against state agencies and agents for failing to comply with the Public Records Act and to avoid the award of statutory damages in those cases. But what is strictly forbidden is for this court to make public-policy decisions and implement them by judicially restricting the rights that incarcerated people have to access public records and chipping away at the Public Records Act one opinion at a time.

{¶ 154} In the end, TCI employees disregarded Berry's request for public records. Berry is entitled to a writ of mandamus, and I would order respondents to produce to both Berry and this court, within ten days of the court's decision, kite numbers 271473441, 271553901, 272785491, 272800391, and 272805871. I

would also order respondents to produce the kites for the public-records requests for the local-policy index and the inmate file directory.

{¶ 155} And since neither Booth nor anyone else at TCI responded to Berry's requests as the law requires, I would award Berry statutory damages of $17,000.

{¶ 156} For all these reasons, I concur in part and dissent in part.

_____

Donny Berry, pro se.

Dave Yost, Attorney General, and John H. Bates, Assistant Attorney General, for respondents.

_____